J. Preston Stieff (4764)
J. PRESTON STIEFF LAW OFFICES, LLC
311 South State Street, Suite 450
Salt Lake City, Utah 84111
Telephone: (801) 366-6002
Email: jps@StieffLaw.com

*Attorneys for Plaintiff*

---

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UTE INDIAN TRIBE OF THE UINTAH AND OURAY INDIAN RESERVATION, a federally recognized Indian Tribe, | **COMPLAINT** |
| Plaintiff, | |
| v. | Civil Case No. 2:23-cv-295 |
| David Ure, Michelle McConkie, Michael Styler, Spencer Cox, Utah School and Institutional Trust Lands Administration, | |
| Defendants. | |

Plaintiff, Ute Indian Tribe of the Uintah and Ouray Reservation ("Tribe" or "Ute Tribe"), by and through its attorneys, alleges and complains as follows:

## GENERAL NATURE OF THE ACTION

1.     In December 2018, the Utah School and Institutional Trust Lands Administration (SITLA) issued a public notice of intent to sell a surface estate that it claimed to own within the exterior boundaries of the Uintah and Ouray Indian Reservation.  That property is known as, and referred to herein as, Tabby Mountain.  The Ute Indian Tribe, which already owned the mineral estate for much of Tabby Mountain, submitted the high bid to re-acquire the surface estate.  It substantially outbid the only other bidder, the Utah Department of Natural Resources (DNR).

2.      When the State of Utah ("State") officers and SITLA officers found out that the Tribe had submitted the high bid, those Defendants did not want to sell the land to Indians, and they immediately began working behind the scenes to try to figure out a way to stop the sale to Indians.  That behind-the-scenes response was quintessential discrimination based upon race, ethnicity, national origin, and religion.

3.      The Defendants worked together to concoct a public record to hide their discrimination based upon race, ethnicity, national origin, and religion.  They first had DNR submit a second bid, higher than the Tribe's bid.  SITLA, DNR, and others who were in on the conspiracy knew DNR's bid was a sham, because DNR did not have sufficient money to meet the required and primary bidding condition—that the bidder could pay the amount bid.  The Defendants had SITLA "suspend" the bidding and sale based upon a pretextual excuse.  SITLA has left the sale in that "suspended status" so that there is no final agency action from which a State appeal could flow.

4.      It is small wonder that Defendants attempted to hide their unlawful and immoral violation of the United States Constitution and federal law by creating a public record based upon their concocted excuse.  But a SITLA whistleblower exposed the Defendants' conspiracy to discriminate based upon race, ethnicity, national origin, and religion.

5.      SITLA officers' intentional decision to wrongfully discriminate was also a violation of those officers' fiduciary duty to the trust and more generally to the State's children. They decided that keeping the land away from the Indians was more important than taking $46,976,000 into trust.

6.      Defendants' actions violate the United States Constitution, federal laws, and state laws.  It is contrary to the general principle that neither the State of Utah nor individuals working

under color of state law can base decisions on racial animosity against Indians (or anyone else based upon racial or national origin).

## PARTIES

7.      Plaintiff Ute Indian Tribe of the Uintah and Ouray Reservation is a federally recognized sovereign Indian tribe.  87 Fed. Reg. 4636 (Jan. 28, 2022).  The Tribe is comprised of three bands of Ute Indians: the Uintah, Whiteriver, and Uncompahgre Bands, who today occupy the Uintah and Ouray Indian Reservation in the Green River Basin of northeastern Utah.  The Reservation is located within a portion of the Tribe's aboriginal lands and encompasses just over four million acres within the Reservation's exterior boundaries.

8.      The Tribe is organized in two ways under the Indian Reorganization Act of 1934 ("IRA"), 25 U.S.C. § 5101-5144.[1]  The Tribe is organized as a tribal government under 25 U.S.C. § 5123 and is also chartered as a federal corporation under 25 U.S.C. § 5124.  The Tribe brings this cause of action on its own behalf and on behalf of its members as *parens patriae* to protect their health, welfare, natural resources, and economic security.

9.      The Tribe has *parens patriae* ("parent of the country") standing to bring claims because the Tribe represents the interests of all its members and raises claims which affect all of its members.  *E.g., Miccosulcee Tribe of Indians v. United States*, 680 F. Supp. 2d 1308 (S.D. Fla. 2010).  "When acting solely in a representative capacity, a tribe's standing is based exclusively on the standing of its individual members: the tribe simply raises claims that its members could raise

---

[1] The IRA is "a statute specifically intended to encourage Indian tribes to revitalize their self-government." *Fisher v. District Court*, 424 U.S. 382, 387 (1976).  The IRA implements a federal policy of reestablishing tribal governments, reconstituting tribal land bases, and revitalizing tribal economies and cultures.  <u>Cohen's Handbook of Federal Indian Law</u> §4.04[3][a], p. 256 (Nell Jessup Newton ed., 2012).

individually, and essentially stands in the same position as they would, had they brought the action collectively." *White Mountain Apache Tribe v. Williams*, 810 F.2d 844, 865 n.l6 (9th Cir. 1984).

10.     SITLA is an independent administrative agency charged with managing school and institutional trust lands for the purpose of maximizing revenue for funding Utah's public schools. Utah Code Ann. § 53C-1-201(1) and (2).

11.     David Ure was the Director of SITLA from about January 2016 until March 2022, and took actions related to this matter under color of the law of the State of Utah.

12.     Michelle McConkie is the current director of SITLA.

13.     Michael Styler was the Director of DNR from about January 2005 until June 2019, and took actions related to this matter under color of the law of the State of Utah.

14.     Joel Ferry is the current Director of DNR and has been in that position since about June 2022.

15.     Utah Governor Spencer Cox is the State of Utah's chief executive officer, and is the successor to Governor Herbert, who was governor from 2009 until 2021.  Governor Cox is responsible for implementing state laws and overseeing the operation of the State's executive branch.  Governor Cox is responsible for ensuring that the State of Utah complies with federal laws, and responsible for violations of that duty to comply with federal laws.

## JURISDICTION

16.     This Court has jurisdiction over this matter because it is a civil action accruing from constitutional violations of federal law accruing under 42 U.S.C. § 1982, § 1983, and § 1985. 28 U.S.C. § 1331, 28 U.S.C. § 1343, 28 U.S.C. § 1362.   This Court also has supplemental jurisdiction under 28 U.S.C. § 1367.

17.     Venue lies in the District of Utah, the judicial district in which Plaintiff resides and in which the acts or omissions complained of occurred.  28 U.S.C. § 1402.

## FACTS

**Facts regarding Plaintiff and Protected Class.**

18.     The Ute Indians of the Uintah and Ouray Indian Reservation constitute a distinct minority population based on race, ancestry, ethnicity, national origin and religion.

19.     The Tribe currently identifies its members through an administrative process for enrollment as a member.  To be enrolled, an applicant must establish, inter alia, that at least one of the applicant's parents was a member of the Tribe, and that the applicant has at least "five eights (5/8) degree of Ute Indian blood of the Tribe."  Ute Ordinance 92-05 (Enrollment).

20.     Each enrolled member of the Tribe is racially and ethnically American Indian.

21.     Each enrolled member of the Tribe is of Ute national origin and has a political affiliation as a member of the Ute Indian Tribe.

22.     Members of the Ute Indian Tribe have a distinct religious/spiritual history, and all or many Ute members continue to practice that religion to varying extents.  The Tribe's religious practices are independent from the Abrahamic religions or any other religions which originated outside of the Americas.

23.     Both historically and currently, the Tribe and its members hold collective and equal rights to the use and enjoyment of all of the land within the Tribe's territory.

24.     These collective rights are, under federal law, now denominated as ownership by the United States in trust for the Tribe.

25.     For lands such as Tabby Mountain, if the Tribe had acquired the surface estate, the land would have been open to use by all members equally, based upon the Tribe's collective ownership law.

26.     The unlawful discrimination described in this complaint deprived the Tribe and each member of the Tribe of ownership of the surface estate in Tabby Mountain.

27.     Had the Tribe acquired the property, that property would have been owned by the Tribe, with all members of the Tribe having equal and indivisible rights in the property, including the right to use the property for any purpose not prohibited by Ute statutory law.

28.     The Tribe's members, including Shawn Chapoose and Edred Secakuku, would have used Tabby Mountain for a variety of purposes, including cultural, religious, and spiritual purposes, and would have used its springs, plants, and medicines if the Tribe had acquired the surface estate of the property.

29.     Tabby Mountain contains game.  The Tribe has hunted on Tabby Mountain since time immemorial.  The Tribe's intent if it had acquired Tabby Mountain was to allow tribal members to hunt on the land.

30.     The Tribe's members, including Shawn Chapoose and Edred Secakuku, would have used the land for hunting and trapping had the Tribe acquired the surface estate of the property.

**Transfer of land at issue from the Tribe to the United States in trust for the Tribe.**

31.     Tabby Mountain is located north of Highway 40, south of Tabiona and north of Fruitland, Utah.  This property lies within the Ute Tribe's ancestral and aboriginal lands and within the exterior boundaries of the Uintah Valley Reservation.

32.     When non-Indian westward expansion reached the Ute's ancestral homelands, the Tribe was forced to cede much of its homeland in exchange for the United States quid pro quo, which included that the Tribe reserved part of its homeland and the United States would protect that land from non-Indian encroachment.

33.     The Uintah Valley Reservation was established by an Executive Order signed by President Abraham Lincoln in 1861 to encompass all lands within the Uinta Basin.  As described in the 1861 Order, the Uintah Valley Reservation was to encompass: "the entire valley of the

6

Uintah River within Utah Territory, extending on both sides of said river to the crest of the first range of contiguous mountains on each side."

34.     Congress subsequently codified the creation of the Uintah Valley Reservation and its boundaries.  Act of May 5, 1864, 13 Stat. 63.

35.     Tabby Mountain is a portion of the above-described land, and has been and remains a prime location for big game hunting.

**Federal transfer of the land from federal trust ownership to fee ownership.**

36.     Thereafter, between 1902 and 1905, the U.S. Congress authorized the allotment of lands within the Uintah Valley Reservation and the sale of the Reservation's so-called surplus lands.

37.     Those congressional acts also authorized then-President Theodore Roosevelt to withdraw certain lands for a variety of federal uses, including reservoirs, federal forest reserves, and federal townships.  President Roosevelt used this delegated authority to withdraw nearly half the land mass of the entire Uintah Valley Reservation – 1,010,000 acres – for a federal forest reserve, lands that today comprise much of the Ashley National Forest.

38.     The events of 1905-1910 established a historical pattern of persistent racial animus and invidious discrimination on the part of the Defendants that continues to this day – animus and discrimination that is directed against the Ute Indians in order to benefit the majority white population of Utah.

39.     Nothing evinces racial animus more clearly than the intentional, purposeful and/or knowing diversion of land from a minority population in order to make that land available for the primary or exclusive benefit of the non-minority population.  It is an incontrovertible fact of American history that non-Indian greed for land and resources is what has motivated nearly all, if

not all, of the racial cleansing and genocidal campaigns that non-Indians in the United States have waged against the Native America populations in the United States.

40.     Plaintiff alleges that it is racial and ethnic animus of this stripe that has motivated the wrongs Plaintiff alleges in their complaint.  Such invidious discrimination on the part of the Defendants is actionable under federal laws.

**Federal transfer of part of mineral estate back to the Tribe and transfer of surface to SITLA in trust.**

41.     In 1956, the United States reserved the mineral estate for some of the parcels on Tabby Mountain for the Tribe.  That mineral estate remains owned by the Tribe.  For the remainder of the parcels, the United States continues to own the mineral estate.

42.     In the 1960's or 1970's, instead of returning the surface lands to the Tribe, the U.S. Forest Service transferred title of Tabby Mountain to SITLA.  SITLA does not own the mineral estate.

43.     The mineral estate is the dominant estate.  Because the Tribe is the beneficial owner of the mineral estate, SITLA, as owner of the surface, cannot prevent the Tribe from developing the mineral estate.

**SITLA's decision to sell.**

44.     SITLA carries out trust responsibilities and other duties provided for in Sections 6-12 of a federal statute, the Utah Enabling Act, 28 Stat. 107 (July 16, 1894).  Those and other trust responsibilities and other responsibilities were further codified into sections 5 and 7 of Article X of the Utah Constitution, and into Titles 53C and 53D of the Utah Code.

45.     Under those federal and state laws, SITLA has the trust responsibility and duty to maximize revenue to the Trust beneficiaries while preserving trust assets for future trust beneficiaries.

46.     In 2007, SITLA, based on its fiduciary duties to SITLA's beneficiaries,[2] refused to sell 28,000 acres on Tabby Mountain to state agencies for public use.

47.     In 2012, Utah Attorney General Mark Shurtleff issued an AG opinion clearly stating that a 1971 statute that guarantees hunter access to all state-owned land does not apply to SITLA trust lands because they are to be managed "for the exclusive benefit of schools."

48.     On January 1, 2016, David Ure became SITLA Director.

49.     In March 2018, in an effort to move SITLA oversight authority away from the State Board of Education, the Utah Legislature passed HB 404, creating the Land Trusts Protection and Advocacy Office with oversight by the state treasurer to protect the interests of the current and future school institutional trust lands beneficiaries.

50.     On March 27, 2018, at the request of SITLA, Highland Commercial delivered a confidential broker price opinion to SITLA, estimating the value of Tabby Mountain to be between $25 million and $37 million, and recommending a $40 million list price with a 24-month marketing period.

51.     In May 2018, DNR, after consulting with SITLA, issued an invitation for bids for an appraisal of Tabby Mountain.

52.     On September 26, 2018, SITLA issued a letter of engagement, engaging Tom Boyer to complete the Tabby Mountain appraisal.  In that letter, SITLA stated to the appraiser that "[t]he intended use of the appraisal report is to facilitate the acquisition of the subject property by

---

[2] SITLA's beneficiaries are the Public Buildings Trust, Utah State Hospital Trust, Juvenile Justice Services Trust, Miners' Hospital Trust, Reservoirs Trust, Colleges of Education Trust, Utah Schools for the Deaf and Blind Trusts, and, by far the largest beneficiary, the Public Schools Trust for K-12 public schools.

DWR."[3]  The intended users of the report include SITLA, DNR, and the U.S. Fish and Wildlife

Service, Wildlife and Sportfish Restoration Program (WSFR)."

53.     As part of its analysis of whether selling the property was in the trust's best interest

SITLA contrasted the proposed minimum sale price of $41,000,000.00 with SITLA's analysis that

the present-day value of all income from Tabby Mountain was $3,240,000.00.

54.     As part of its analysis of whether selling the property was in the trust's best

interests, SITLA concluded that in Fiscal Year 2019, it would distribute only $9,501.20 to trust

beneficiaries if it continued to own the surface estate at Tabby Mountain, but would distribute

$1,640,000.00 to the beneficiaries if it sold the land for $41,000,000.00.  The estimated distribution

to public schools was $5,961.18 if it owned the land, but $1,361,200.00 if it sold the land.

55.     Selling the land was in the best interest of the Trust and the trust beneficiaries.

56.     On December 4, 2018, SITLA considered a proposal to sell the land for a minimum

bid of $41,000,000.  At that time, SITLA believed that DNR would be the sole bidder at that price.

57.     On December 4, SITLA's board of trustees unanimously concluded that selling the

land for a minimum bid of $41,000,000 was in the best interest of the trust.   In its meeting

summary, SITLA noted it was aware that state agencies have interest in purchasing the property,

and that because SITLA only owned the surface estate and "very little water associated," there is

difficulty generating revenue from a property of this size.

58.     SITLA further noted that "In addition, there have been significant political issues

surrounding the sale over the years."

59.     To monetize the asset more quickly, SITLA decided that because monetizing the

asset more quickly was in the Trust's best interests, SITLA would advertise the bid solicitation for

---

[3] DWR, the Division of Wildlife Resources, is one of the divisions within the Utah DNR.

about one month, rather than undertake the two-year international marketing period which Highland Commercial had suggested.

60.     On December 13, 2018, SITLA mailed a letter and public notice informing the Tribe that it planned to sell Tabby Mountain.  SITLA set the minimum acceptable bid at $41,000,000.00.

61.     On December 19, 2018, the Tribe mailed a letter to SITLA expressing its interest in participating as a competing bidder.  In total, at least 10 entities submitted letters of interest.

62.     On December 20, 2018, Margaret Bird (in a role as a consultant and also on behalf of two state university realty officers) sent a memo to SITLA Director Ure regarding the proposed sale.  She did not question whether selling the land was in the Trust's best interests, but did question the prudence of the proposed plan for marketing the property.

63.     In that memo, Bird specifically questioned whether a longer marketing period would be better.

64.     In that same memo and related communications, Ms. Bird expressed her view that Director Ure had structured the sale process with the goal of selling the land to DNR, instead of with the goal of maximizing the income to the trust.

65.     SITLA adamantly rejected Ms. Bird's contentions.

66.     On December 28, 2018, SITLA mailed a letter to the Tribe stating that it received and accepted the Tribe's letter of interest.  Simultaneously, SITLA informed the Tribe that it had decided to extend its deadline for letters of interest to January 31, 2019.

67.     On January 31, 2019, SITLA mailed the Tribe information regarding the bidding procedures for the sale.  SITLA required that all eligible bidders mail a sealed bid, signed Offer to Purchase, and $1,000,000.00 earnest money deposit to SITLA by 5:00 p.m. on February 15, 2019.

11

68.    SITLA drafted an "Offer to Purchase," specific to the Tabby Mountain sale, and SITLA required bidders to execute that Offer to Purchase as a condition of submitting a valid bid.

69.    The Offer to Purchase provided that the bidder was making a *binding* offer to purchase the property if it was the successful bidder.  SITLA's form's Offer to Purchase also required the bidder to submit a certified check for $1,000,000 as an earnest money payment.

70.    The Offer to Purchase further specified: "SITLA will *not* refund the successful Bidder's earnest money deposit for any reason, but *will* credit it toward the final purchase price." Ex. 1 (emphasis added).

71.    The required Offer to Purchase further, and repeatedly, stated that the sale would be completed, and it incorporated by reference the terms of that sale: "All sales will be finalized on SITLA's standard certificate of sale."

**Tribe's high bid and Utah and SITLA's discriminatory response.**

72.    On February 15, 2019, the Tribe submitted its complying sealed bid and binding Offer to Purchase to SITLA with an offer of $46,976,000.00.

73.    DNR submitted a bid for $41,000,000.  DNR disclosed in its bid that it did not even have the resources to pay the amount it had bid, and that its bid was therefore contingent on it receiving money from both the United States and the Utah legislature.

74.    On Tuesday, February 19, 2019, SITLA Director Ure sent a letter to Ute Business Committee Chairman Luke Duncan notifying him that SITLA had received the Tribe's bid.

75.    The Tribe and DNR were the only parties to bid.

76.    When SITLA and DNR became aware that the Tribe was the high bidder, they conspired to make sure SITLA would not sell the land to the Tribe, but they both knew that DNR did not have the financial ability to make a binding bid which would exceed the Tribe's bid.

77.     On February 19, 2019, at a meeting of the Land Trust Protection and Advocacy Committee, committee members expressed concerns that if the Tribe owned Tabby Mountain, Indians would control access to the land and could prevent non-Indians from accessing the land.

78.     On February 28, 2019, when SITLA Special Projects Manager Tim Donaldson suggested a resolution which might involve negotiation with the Tribe for possible deed restrictions for public sportsmen, Director Ure responded that the decision had been made not to contact the Tribe.

79.     SITLA and DNR's first plan for thwarting sale to the Tribe was for DNR to seek additional funds from the State, so that it could outbid the Tribe.  They lobbied state legislators, but were unable to obtain the requisite funding.

80.     Thereafter, Defendants conspired that if they could not sell the land to DNR, SITLA would suspend the sale, to prevent the Tribe from acquiring the land.

81.     SITLA took that step despite SITLA's Board's prior unanimous conclusion that selling the property was in the best interest of the Trust, and despite the fact that selling the property was in SITLA's best interest.

82.     As part of their conspiracy and also to hide their unlawful conspiracy from the Tribe and the public, Defendants created a false public record.

83.     Behind the scenes, Defendants conspired that the public record would begin with SITLA publicly giving DNR an opportunity to increase its bid and that DNR would then submit a new bid which exceeded the Tribe's bid.

84.     Defendants knew that DNR's new bid would be a sham, because they knew DNR did not have the ability to pay any bid which would match or exceed the Tribe's bid.

85.     Consistent with that conspiracy, on February 20, 2019, SITLA publicly gave DNR twenty-four hours to counter the Tribe's bid.

86.     Consistent with that conspiracy, DNR submitted a new written bid of $50,000,000.

87.     DNR's bid of $50,000,000.00, like its prior bid of $41,000,000, was contingent upon DNR accessing and transferring millions of dollars of federal funds to SITLA, and therefore discrimination against Indians was further prohibited by 42 U.S.C. § 2000d.

88.     On February 21, 2019, Director Ure sent a letter to the Tribe stating that DNR countered the Tribe's bid with a higher bid of $50,000,000.00.  At the time Director Ure sent that letter, Defendants knew the bid of $50,000,000 was a sham.

89.     Behind the scenes, Defendants conspired that after it received DNR's sham bid, SITLA would promptly suspend the sale, without review of whether DNR could meet its bid.

90.     Defendants knew that any such review would quickly result in an admission that DNR could not pay the amount it bid, that the Tribe remained the high bidder, and that Defendants had engaged in the conspiracy to prevent sale to the Tribe.

91.     Defendants knew that public disclosure that DNR's bid was a sham would subject SITLA to claims for breach of fiduciary duty and would subject the Defendants to claims of discrimination, violation of state laws, and other wrongs.

92.     Consistent with the conspiracy, after receiving DNR's sham bid, SITLA and Director Ure postponed the sale indefinitely without giving the Tribe or anyone else an opportunity to question DNR's sham bid and without giving the Tribe an opportunity to increase its bid.

93.     On February 22, 2019, SITLA issued a press release, providing public notice that it had voted to "temporarily suspend proceedings on a proposed sale."  SITLA Director Ure sent a letter informing the Tribe that SITLA's Board of Trustees voted to suspend the proposed sale, and

14

falsely stating that the reason for the suspension was for SITLA to address the trust beneficiaries' concerns regarding the accuracy of the appraisal and the length of time that the property was advertised.

94.     Prior to learning that the Tribe was the highest true bidder, SITLA had previously considered and rejected those exact concerns.

95.     After it suspended the sale, SITLA did not commission a new appraisal, nor did it authorize a new effort to advertise or take other steps to sell the property.

96.     Although SITLA did not take action to remarket the property, it did, after February 22, 2019, consider options for attempting to permanently transfer rights in the land to DNR without competitive bidding.

97.     Director Ure stated that SITLA would reach out to the Tribe "when it determines to move forward with further action."  Ure knew this was a false statement, and SITLA would move forward if, but only if, it could find a way to transfer the land to DNR without risk of Indians buying the land.

98.     SITLA knew that its assertion to the public and to the Tribe that it was temporarily suspending the sale in order to address concerns regarding the appraisals and length of time the property was advertised was false.

99.     SITLA's assertion to the public and to the Tribe that it was temporarily suspending the sale in order to address concerns regarding the appraisal and the length of time the property was advertised was pretext.

100.     SITLA's assertion to the public and to the Tribe that it was temporarily suspending the sale in order to address concerns was intended to deceive and did deceive the beneficiaries of the trust, the public, the Tribe, and the Tribe's members.

101.    No Defendant disclosed to the Tribe or the public that DNR's bid was a sham, nor did they disclose to the Tribe or the public that their public assertion that they were only temporarily suspending the sale was false, nor did they disclose to the Tribe or the public that SITLA had rejected sale to the Tribe in violation of its trust obligations and in violation of anti-discrimination laws.

102.    Defendants' conspiracy was unlawful discrimination against the Ute Indian Tribe and its members.

103.    Defendants' conspiracy violated SITLA's trust duties and its agents' fiduciary duties.

104.    On February 26, 2019, Ute Indian Tribe Chairman Duncan sent a letter to SITLA Director Ure expressing the Tribe's concerns regarding SITLA's conduct in handling Tabby Mountain.  The Tribe demanded that SITLA honor the Tribe's right to purchase the property pursuant to the bidding process and requirements set out in SITLA's bidding requirements and related documents.

105.    On August 30, 2022, Tim Donaldson, Director of the Utah Land Trust Protection and Advocacy Office filed a formal complaint alleging that the bid sale was rigged from the beginning to prevent the Tribe from acquiring Tabby Mountain.

106.    On August 31, 2022, the Utah Land Trust Protection and Advocacy Office, retaliated against Donaldson by firing him.

107.    In furtherance of Defendants' conspiracy to prevent the Tribe from executing a contract to purchase the property, Defendants proposed at the next legislative session that the legislature appropriate funds sufficient to allow DNR to outbid the Tribe.

108.     On information and belief, if the legislature had enacted the bill, SITLA was prepared to lift the suspension of the sale, but because the bill was not approved, SITLA is continuing to hold the sale, which would be to the Tribe as the only true bidder, in a suspended status.

**Facts related to remedies.**

109.     SITLA is holding the sale in a suspended status, rather than cancelling the sale, based upon the same unlawful discriminatory intent and conspiracy to discriminate discussed above.

110.     Canceling the sale would be a final agency action and would permit the Tribe, trust beneficiaries, or other harmed parties to access state courts through an appeal.

111.     SITLA is using the indefinite suspension and the false public record to attempt to prevent the Tribe from access to the Utah State Courts or federal courts.

112.     Tabby Mountain is unique, and therefore monetary compensation for Defendants' unlawful acts would not be an adequate remedy.

113.     "Realty has always been held to be unique, and in the case of the sale of land, the inadequacy of the legal remedy is well settled." *SMS Fin., LLC v. CBC Fin. Corp.*, 2017 UT 90, ¶ 15, 417 P.3d 70, 75 (internal punctuation and citations omitted).

114.     Monetary damages are also inadequate here because of the Tribe's unique and specific interests in Tabby Mountain.  Tabby Mountain is land to which the Tribe held aboriginal title, and then held beneficial and compensable title after the United States created the Uintah Valley Reservation.

115.     Tabby Mountain, and the plants, natural resources, springs, and medicines found on that property have unique religious and spiritual significance to the Tribe and to tribal members.

116.    For the Tribe and its members, monetary compensation is not an adequate remedy. Reacquisition of the surface estate is the only adequate remedy for the Tribe.

117.    In Article I, Section 24 of the Utah Constitution, the State commits to its citizens that it will uniformly apply its laws.  That includes a commitment by the State that it will not discriminate based upon race, national origin, ethnicity, or religion.

118.    In Article I, Section 7 of the Utah Constitution, the State commits to its citizens that it will not deprive any person of life, liberty or property without due process of law.

119.    In Article I, Section 4 of the Utah Constitution, the State commits to its citizens that it will not discriminate based upon religious affiliation.

120.    The State's commitment to its own citizens is redundant to commitments which the State made in 1896, when it joined the United States.  Those included commitments that it would provide due process and equal protection to all, and that it would not discriminate based upon race, national origin, ethnicity, or religion.

121.    As relevant to this matter, the Ute Indian Tribe reasonably expected that the State of Utah and the Defendants would not discriminate against the Tribe based upon race, national origin, ethnicity, or religion.

122.    When it submitted its bid, the Ute Indian Tribe submitted $1,000,000 as earnest money and further made the binding agreement it would provide SITLA with the remaining $45,976,000 of the purchase price.

123.    The Tribe's submission of the earnest money payment and the further commitment to submit the remaining $45,976,000 were made in reliance on the State's promises in its Constitution and in its decision to join the United States, that it would not discriminate against the

Tribe or tribal members based upon race, national origin, ethnicity, or religion and upon SITLA's promise that sale to the high bidder would be finalized.

**COUNT I**

**Denial of Due Process and Equal Protection and Conspiracy to Violate Rights; United States Constitution 5th and 14th Amendment, 42 U.S.C. § 1981, 1982 1983, 1985, 2000d (all Defendants; federal law)**

124.    Plaintiff incorporates and re-alleges all paragraphs and allegations in this Complaint as if fully set forth herein.

125.    42 U.S.C. § 1982 provides:

> All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

126.    42 U.S.C. § 1981 provides in relevant part:

> All persons within the jurisdiction of the United States shall have the same right in every state…to make and enforce contracts…and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens.

127.    The Civil Rights Act of 1991 amended § 1981 by clarifying that "make and enforce contracts" "includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship," and provides that "[t]he rights protected [thereunder] are protected against…impairment under color of state law."

128.    Violations of §1981 and §1982 may be brought in a federal forum via 42 U.S.C. § 1983, which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceedings for redress.

129.    The Tribe is a person for purposes of being a plaintiff under 42 U.S.C. § 1981, 42 U.S.C. § 1982, 42 U.S.C. § 1983 and 42 U.S.C. § 1985.

130.    The Tribe's members are citizens of the United States, and citizens of the Ute Indian Tribe.

131.    The Tribe's members living within the State of Utah are citizens of the State of Utah.

132.    The Tribe and its members are "members of a protected class" based upon race, national origin, ethnicity, and religion.

133.    SITLA is a person for purposes of being a defendant under 42 U.S.C. § 1981 and 42 U.S.C. § 1983.

134.    This Court has original jurisdiction of a suit commenced by a person based upon violation of 42 U.S.C. § 1985 and for any conspiracy to violate 42 U.S.C. § 1985.

135.    SITLA and/or its officers' decision to refuse to sell the land to the Tribe was motivated by animus based upon race, national origin, ethnicity, and religion.

136.    All Defendants participation in the conspiracy to prevent sale to the Tribe was motivated by animus based upon race, national origin, ethnicity, and religion.

137.    Defendants' actions and conspiracy to create a public record to hide the true reason for SITLA's decision to suspend the sale were based upon animus based upon race, ethnicity, national origin, and religion.

138.    Defendants' decision to suspend the sale or to participate in the conspiracy to further that wrongful discrimination, and the related actions to create a public record to hide the true reason for their decision interfered with and prevented the Tribe from making or enforcing a contract for the purchase of Tabby Mountain.

20

139.    Those related actions include: A) the decision that the land would not be sold to the Tribe as the highest legitimate bidder; B) the decision and actions to have DNR issue a bid for which DNR did not have the requisite ability to meet if the bid had been accepted; C) the decision to suspend the sale soon after receipt of DNR's bid; and D) the decision to leave the matter in a suspended state, instead of issuing a final and appealable administrative decision.

140.    Defendants' actions denied Plaintiff the same right as is enjoyed by non-Indians to purchase and hold real property and to make and enforce contracts.

141.    All of the actions and decisions of the Defendants were taken under color of state law, custom, or practice and in violation of the due process and equal protection rights of the Tribe and its members.

142.    But for the unlawful discrimination, SITLA would have sold the property to the Tribe for $46,976,000 under the conditions which SITLA included in the "Offer to Purchase" to which SITLA required the Tribe and other bidders to submit and to agree.

143.    Defendants have conspired and acted in concert, and in concert with others outside the State Government, to further their unlawful discrimination and to create a false public record in an effort to hide their unlawful discrimination.

144.    Defendants' actions have caused substantial and ongoing economic harm to the Ute Indian Tribe and its members.

145.    Defendants' actions have caused actual damages to the Tribe and its members in an amount to be proven at trial.

146.    Defendants' actions have deprived the Tribe and its members of ownership, use, and enjoyment of Tabby Mountain, which is a unique property.

147.     Defendants' refusal to enter into a contract with the Tribe violates 42 U.S.C. § 1981 and 1982.  Defendants' conspiracy related thereto violates 42 U.S.C. § 1985.

## COUNT II

**Declaratory and Injunctive Relief to Remedy Violation of Equal Protection and Due Process (all Defendants; federal law)**

148.     Plaintiff incorporates and re-alleges all paragraphs and allegations in this Complaint as if fully set forth herein.

149.     The sale and transfer of Tabby Mountain to the Tribe would have been completed but for Defendants' unlawful discrimination and unlawful conspiracy.

150.     This Court has broad authority to structure relief to remedy unlawful discrimination, including the power to order specific performance of the sale that would have been completed but for Defendants' unlawful discrimination.

151.     Specific performance is an appropriate remedy here, as it is the only adequate remedy to the injured Plaintiff for part of the violation of Plaintiff's civil rights.

## COUNT III

**Breach of Trust (SITLA and SITLA officers; State law) and Conspiracy to Violate Law (all Defendants, State and federal law)**

152.     Plaintiff incorporates and re-alleges all paragraphs and allegations in this Complaint as if fully set forth herein:

153.     SITLA and its officers and employees act as trustees for the benefit of SITLA's beneficiaries.  That trust responsibility arises under both the Utah Enabling Act and related federal laws and under State law.

154.     As set forth in detail above, SITLA's and Director Ure's decision to prevent sale to the Tribe violated SITLA and Director Ure's duties to the trust and to SITLA's trust beneficiaries.

Their actions violated SITLA's trust obligation to maximize income to the trust over non-monetary values—whether those non-monetary values are racist or some other non-monetary values.

155.    SITLA and its officers are subject to suit for violation of federal and state laws which create their duties to the Trust and to the Trust's beneficiaries.

156.    All Defendants participated in the conspiracy to have SITLA violate federal and state law, and all Defendants took substantial steps in furtherance of that conspiracy; and those substantial steps resulted in SITLA actually breaching its duties to the trust.

157.    The Tribe, on both its own behalf and on behalf of its members, has standing to bring suit challenging SITLA's breach of trust.

158.    For the reasons discussed above, the Tribe and its members have suffered multiple distinct and palpable injuries from SITLA's breach of duties to SITLA's beneficiaries.  These include the injury to the Tribe and its members because the Tribe was not able to purchase the property; and the injury to the Tribe, in *parens patriae,* for the many tribal member students who benefit from SITLA financial payments to schools.

159.    SITLA's refusal to sell the property to the Tribe deprived SITLA's trust of approximately $46,975,000, money which would have benefitted schools and school children, including the Tribe's school children.

160.    The Tribe and its members also have standing because SITLA's breach of trust is an issue of public importance, and the Tribe and its members have the most significant interest in the outcome.

161.    As the only true bidder for the property, the Tribe and its members are likely the only parties who can challenge SITLA's refusal to complete the sale to the Tribe, and the Tribe's

interest in completing the sale gives it the required adversarial relationship to bring and to competently litigate to correct the violation of SITLA's trust duties.

162.     The remedy for a breach of trust includes: compelling the Trustee to comply with its trust duties, redressing past violations, enjoining ongoing violations, and/or voiding acts which were violations.  A court therefore has power under the facts of this matter to compel SITLA to complete the sale to the only bidder, a sale which SITLA would have completed if it had complied with its duty to maximize monetary income over non-monetary values.

**COUNT IV**

**Fraud and Conspiracy to Commit Fraud (all Defendants; State law)**

163.     Plaintiff incorporates and re-alleges all paragraphs and allegations in this Complaint as if fully set forth herein:

164.     The element of a fraud claim under Utah law are:

(1) that a representation was made (2) concerning a presently existing material fact (3) which was false and (4) which the representor either (a) knew to be false or (b) made recklessly, knowing that there was insufficient knowledge upon which to base such a representation, (5) for the purpose of inducing the other party to act upon it and (6) that the other party, acting reasonably and in ignorance of its falsity, (7) did in fact rely upon it (8) and was thereby induced to act (9) to that party's injury and damage.

*Armed Forces Ins. Exch. v. Harrison*, 2003 UT 14, ¶ 16, 70 P.3d 35, 40 (internal citations and quotations omitted).

165.     Where two or more persons work together to commit fraud, each is liable for conspiracy to commit fraud.

166.     Defendants conspired to commit fraud against the Tribe, and the Tribe expects that discovery in this matter will establish that others in the Utah Executive Branch and Legislative Branch and others outside of State government were part of that conspiracy to commit fraud.

167.     Defendants SITLA and Ure represented to the Tribe that DNR had submitted a legitimate bid of $50,000,000.  At the time that SITLA and Ure made that representation to the Tribe, they knew it was false.

168.     Defendants SITLA and Ure represented to the Tribe that SITLA had suspended the sale for a lawful reason.  At the time that SITLA and Ure made that representation, they knew it was false.

169.     Defendants made false allegations and hid facts for the purpose of inducing the Tribe not to challenge the suspension of the sale; inducing the Tribe to not seek enforcement of the sale based upon the Tribe's bid, and inducing the Tribe to not seek information which would show that Defendants had conspired to violate state and federal law so that they could prevent Indians from buying back Tabby Mountain.

170.     The Tribe reasonably relied upon and acted upon Defendants assertion that SITLA had a legitimate bid of $50,000,000 from DNR.  At that time, the Tribe did not know that SITLA's representation was false, and the Tribe was reasonably induced to act in reliance of SITLA's knowingly false allegation.

171.     The Tribe suffered immediate and proximate damages from Defendants' fraud.  But for the false allegation, the Tribe would have challenged SITLA refusal to sell to the Tribe, and would have obtained the use and enjoyment of the unique property for the past four years, and would have obtained any income or appreciation in value of the property during that period of time.

**COUNT V**

**Breach of Contract/Estoppel/Equitable Conversion (SITLA; State law)**

172.     Plaintiff incorporates and re-alleges all paragraphs and allegations in this Complaint as if fully set forth herein:

173.    The elements of a claim for breach of contract are: 1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the contracting party.

174.    The Tribe pleads that the facts establish a contract for sale of the land.  In the alternative, the Tribe pleads that promissory estoppel, equitable estoppel, or equitable conversion provide the missing elements for contract formation.

175.    Promissory estoppel and/or equitable estoppel apply when there is (1) a representation reasonably expected to induce reliance; (2) reasonable reliance inducing action or forbearance on the part of the party to whom the representation is made; and (3) detriment to the person to whom the representation is made.  *Youngblood v. Auto Owners Ins. Co.*, 207 UT 28 (Utah 2007).

176.    Had SITLA acted without discriminatory intent, SITLA would have accepted the Tribe's bid of $46,976,000.

177.    SITLA's representation that sale to the high bidder would be completed was reasonably expected to induce the Tribe to rely on SITLA not halting the sale based upon discrimination against the Tribe and its members.

178.    Equitable conversion is based upon the maxim that equity regards that as done which ought to have been done.  It applies where there is no adequate remedy at law for what ought to have been done, and primarily applies where what "ought to have been done" is transfer of ownership of real property.

179.    What "ought to have been done" was the acceptance of the Tribe's bid, since that bid would have been accepted but for the unlawful discrimination of the Defendants and but for the SITLA Defendants' breach of fiduciary duties.

180.     The Tribe and its members reasonably relied upon the expectation that SITLA and the named defendants would act without discriminatory intent.

181.     The Tribe and its members reasonably relied upon the expectation that SITLA would comply with its fiduciary duties to the Trust.

182.     The Tribe and its members reasonably relied upon the expectation that SITLA's representation to the public and to the Tribe, that SITLA was only temporarily suspending the sale while it reviewed appraisal and marketing issues was truthful.

183.     The Tribe and its members have been harmed by their reasonable reliance.  This includes that the Tribe provided $1,000,000 in earnest money to SITLA, and it covenanted with SITLA that it would readily pay the remaining $45,976,000 upon acceptance of its bid.  The Tribe further changed positions by taking actions so that it was ready and able to comply with its covenant to pay the balance.

**WHEREFORE, PLAINTIFF PRAYS FOR THE FOLLOWING RELIEF:**

1.     A declaration that SITLA's decision not to sell the land to the Tribe for $46,976,000 was based upon unlawful discrimination by the Defendants.

2.     Specific performance of the contract, as supplemented by promissory estoppel.

3.     A declaration that to remedy the violations of law, SITLA is required to sell the land to the Tribe for $46,976,000 or such lesser amount to offset for damages to the Tribe.

4.     An award of actual and punitive damages in an amount to be determined at trial.

5.     An award of costs and disbursements incurred in this lawsuit, without limitation, including attorney's fees under 42 U.S.C. §1988 and other applicable statutes, and under general principles of law and equity.

6.      An award of such other and further relief, both at law and in equity, as the Court

determines to be just and proper.

DATED this 5th day of May, 2023.

J. PRESTON STIEFF LAW OFFICES, LLC

*/s/ J. Preston Stieff*
J. Preston Stieff
*Attorney for Plaintiff*
