J. Preston Stieff (4764)
J. PRESTON STIEFF LAW OFFICES, LLC
311 South State Street, Suite 450
Salt Lake City, Utah 84111
Telephone: (801) 366-6002
Email: jps@Stiefflaw.com

Jeremy J. Patterson, *Pro Hac Vice Admission*
Linda F. Cooper, *Pro Hac Vice Admission*
Michelle E. Long, *Pro Hac Vice Admission*
PATTERSON EARNHART REAL BIRD & WILSON LLP
1900 Plaza Drive
Louisville, Colorado 80027
Telephone: (303) 926-5292
Facsimile: (303) 926-5293
Email: jpatterson@nativelawgroup.com
Email: lcooper@nativelawgroup.com
Email: mlong@nativelawgroup.com

## UNITED STATES DISTRICT COURT
### DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UTE INDIAN TRIBE OF THE UINTAH AND OURAY INDIAN RESERVATION, a federally recognized Indian Tribe,<br><br>Plaintiff,<br><br>v.<br><br>David Ure, Michelle McConkie, Michael Styler, Spencer Cox, Utah School and Institutional Trust Lands Administration<br><br>Defendants. | **RESPONSE IN OPPOSITION TO MOTION TO DISMISS BY GOVERNOR COX AND FORMER DIRECTOR STYLER**<br><br>Civil Case No. 2:23-CV-00295<br><br>Jude David B. Barlow<br><br>Magistrate Judge Daphne A. Oberg |

i

**<u>CONTENTS</u>**

INTRODUCTION ........................................................................................................... 1

I.     Governor Cox is a proper Defendant. ................................................................ 2

II.    Director Styler is a proper Defendant. .............................................................. 5

III.   Defendants' arguments in section 3.1 and 3.2 of their briefs should be denied for the same reason that SITLA's same arguments should be denied. ................................................. 6

IV.    Defendants' undeveloped argument in section 3.3 must be rejected. ................................. 6

V.     Defendants' argument for dismissal under section 3.4 is frivolous. ................................. 6

   A.    Distinction between evidentiary standard in discrimination cases and pleading standard. ................................................................................................. 7

   B.    Application of the Pleading standard for Intentional Discrimination. ........................... 10

      1.    The Tribe's Complaint Alleges Direct and Circumstantial Evidence of Invidious Discrimination, Despite that Only One Form of Evidence is Required ............................... 11

VI.    The Tribe has Pleaded with Particularity Sufficient Facts Supporting its Claims for Fraud and Fraud Conspiracy Committed by Defendants Cox and Styler ................................... 17

   A.    Fraud ................................................................................................... 17

   B.    Fraud Conspiracy ..................................................................................... 21

VII.   Defendants' unclear argument for dismissal of state law claims should be denied for reasons discussed in the Tribe's response to Defendant Ure. ................................................ 23

Conclusion ............................................................................................. 23

v

Page(s)

Cases

*Armed Forces Ins. Exch. v. Harrison,*
  2003 UT 14, 70 P.3d 35 ................................................................................ 18
*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ................................................................................ 9, 17
*Burns v. Bd. of Cnty. Comm'rs of Jackson Cnty.,*
  330 F.3d 1275 (10th Cir. 2003) ................................................................ 10
*EEOC v. Port Auth of N.Y & N.J.,*
  768 F.3d 247 (2d Cir. 2013) ..................................................................... 10
*Ex parte Young,*
  209 U.S. 28 S.Ct. 441 ................................................................................. 3
*Gonzalez v. Feinerman,*
  663 F.3d 311 (7th Cir. 2011) ...................................................................... 4
*Hendrickson v. AFSCME Council 18,*
  992 F.3d 950 (10th Cir. 2021) ................................................................ 2, 3
*Israel Pagan Est. v. Cannon,*
  746 P.2d 785 (Utah Ct. App. 1987) ..................................................... 21, 22
*Kendrick v. Penske Transp. Servs., Inc.,*
  220 F.3d 1220 (10th Cir.2000) ................................................................. 10
*Nat'l Parks & Conservation Ass'n v. Bd. of State Lands,*
  869 P.2d 909 (Utah 1993) ......................................................................... 15
*Navajo Nation v. San Juan Co.,*
  162 F. Supp. 3d 1162 (2016) ............................................................... 13, 16
*Parkell v. Danberg,*
  833 F.3d 313 (3d Cir. 2016) ....................................................................... 4
*Patterson v. MacDougall,*
  506 F.2d 1 (5th Cir. 1975) .......................................................................... 4
*Pouncil v. Tilton,*
  704 F.3d 568 (9th Cir. 2012) ...................................................................... 4
*Prairie Band Potawatomi Nation v. Wagnon,*
  476 F.3d 818 (10th Cir. 2007) .................................................................... 3
*SECSYS, LLC v. Vigil,*
  666 F.3d 678 (10th Cir. 2012) ................................................................. 7, 8
*Shotz v. v. City of Plantation Fla.,*
  344 F.3d 1161 ............................................................................................ 6
*Swierkiewicz v. Sorema N. A.,*
  534 U.S. 506 (2002) ................................................................................. 10
*Taylor v. City of New York,*
  207 F. Supp. 3d 293 ................................................................................. 10

iii

*Vega v. Hempstead Union Free Sch. Dist.*,
   801 F.3d 72 (2d Cir. 2015) ............................................................................. 10
*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977) ....................................................................... 8, 9, 10, 11
*Villanueva v. Carere*,
   85 F.3d 481 (10th Cir. 1996) ......................................................................... 10
*Yick Wo v. Hopkins*,
   118 U.S. 356 (1886) ......................................................................................... 8

Statutes

42 U.S.C. § 1983 ...................................................................................................... 9
Utah Stat. 53D-2-201 ............................................................................................... 3

Rules

Federal Rule of Civil Procedure 8(a)(2) ............................................................. 9, 17
FRCP 8(a) ........................................................................................................... 9, 17
FRCP 9(b) ........................................................................................................ 17, 19
FRCP 19 ................................................................................................................... 4

Other Authorities

13 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3524.3 (3d ed.,
   Oct. 2020 update) .......................................................................................... 3

## INTRODUCTION

Since early 2019, the Utah School and Institutional Trust Lands Administration (SITLA), Utah Department of Natural Resources (DNR), officers of each, and the political branches in the State of Utah have been engaged in an ongoing conspiracy to discriminatorily prevent the Ute Indian Tribe (Tribe) from purchasing a parcel of land on the Tribe's Uintah and Ouray Reservation (Reservation).  This suit seeks to properly remedy that ongoing wrong.

Early in 2018, SITLA's Board unanimously determined that it was in the best interest of SITLA and its trust beneficiaries to sell the portions of the surface estate in Tabby Mountain which SITLA owned (hereinafter Tabby Mountain).

But when the Tribe was the highest bidder for that property, the State Executive Branch and SITLA worked behind the scenes to 1) prevent the sale of the property to the Tribe, and 2) concoct a public-facing record through which they, knowingly falsely, misled the Tribe and SITLA's trust beneficiaries by claiming that they were "suspending" the sale to address two non-discriminatory concerns.

Based upon information from a State whistleblower, they were caught.

Now, each of the Defendants in this case submits a shotgun motion to dismiss.  Many of the Defendants' innumerable arguments are no more than a sentence or two, often misstating immaterial legal rules, and for every one of their arguments, they are misstating the Tribe's claims.

In their motion to dismiss, Governor Cox and former Directly Styler primary rely upon their open misstatement of the Tribe's claims against them.  They argue that the Tribe's discrimination claims are solely against SITLA for actions in early 2019.  That is not the Tribe's sole, or primary, claim.  Instead, the Tribe's claim is based upon the now-exposed ongoing conspiracy by SITLA, DNR, and others to discriminatorily prevent the sale to the Tribe through their continued pretense of holding the sale in abeyance.

1

I.       **GOVERNOR COX IS A PROPER DEFENDANT.**

In his brief, Governor Cox asserts that he is not a proper party based upon his odd assertion that he has no responsibility to rectify SITLA's ongoing invidious discrimination.

His argument is wrong for at least five independent reasons.

First, his argument is based upon his open attempt to re-write the Tribe's complaint.  He argues as if the Tribe's claims are solely against SITLA, and then asserts he is not a proper party to that claim because, he alleges, he has no "role in the sales, transfer or exchanges of SITLA properties."  M. at 23.  The Tribe largely (but not completely, as noted below) agrees with Governor Cox that the Executive Branch **should not** have taken on any role –it should not have interfered--once the Tribe was the high bidder for the property.  SITLA is supposed to act consistent with its duty to benefit the school trust, not to please state politicians, hunters, or the DNR.  The Governor has "some connection," *Hendrickson v. AFSCME Council 18*, 992 F.3d 950, 965 (10th Cir. 2021), with making sure that Executive Branch officers comply with the exact statutory limitation that Governor Cox discusses.  And, as the Tribe's complaint plainly alleges, the Executive Branch violated that statutory limitation.

Second, and closely related, even if we assumed arguendo that the Governor lacks any responsibility for remedying wrongful discrimination by *SITLA*, he most definitely does have that responsibility for the rouge *DNR* officers who have worked hand in glove with SITLA to cause the ongoing discriminatory wrong and violation of trust responsibilities, and other wrongs allege in the complaint.  The Executive Branch took a lead role in preventing the sale, and the Governor is a proper party regarding that wrong.  The Executive Branch should not have interfered.  But it did, and it did so for blatantly discriminatory reasons, and it can be sued for that.

Third, and only slightly more complex, Governor Cox attempts to use, out of context, the Tenth Circuit's short parenthetical quotation from a section of Wright & Miller (that "a general

duty to enforce the law" is insufficient) to assert that this Court should issue a holding which is the opposite of the actual holding in *Hendrickson*.  M. at 18.  The actual holding from *Hendrickson*, instead of the snippet from Wright & Miller which Governor Cox attempts to use out of context, is:

> "The fact that the state officer, by virtue of his office, has some connection with the enforcement of the act, is the important and material fact." *Id. Ex parte Young* does not require that the state official "have a 'special connection' to the unconstitutional act or conduct." *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 828 (10th Cir. 2007).  But it does require that the state official "have a particular duty to 'enforce' the statute in question and a demonstrated willingness to exercise that duty." *Id.* (quoting *Ex parte Young*, 209 U.S. at 157, 28 S.Ct. 441); *see also* 13 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3524.3 (3d ed., Oct. 2020 update) ("[T]he duty must be more than a mere general duty to enforce the law.").

*Hendrickson*, 992 F.3d at 965.

Governor Cox, by virtue of his office, has "some connection" with having state officers comply with state and federal anti-discrimination laws, and with protecting the rights of SITLA's trust beneficiaries from rouge SITLA and DNR officers.  The State of Utah created a separate watchdog agency within the Executive Branch, to keep an eye on SITLA's Board and to raise concerns that SITLA's Board is not complying with its trust duties.  Utah Stat. 53D-2-201.  *See also* Compl. ¶¶ 62-64 (discussing a letter from members of that watchdog group).  53D-2-201 expressly provided that the State Treasurer has the fiduciary duties to oversee that entity (currently the "Land Trust Protection and Advocacy Office").  Tellingly, the Governor does not claim he lacks responsibility for complying with or rectifying Executive Branch violations with that law or with state and federal anti-discrimination laws.  Instead, his argument is based upon his attempt to re-write the Tribe's complaint to eliminate the Tribe's obvious claim against him.

Fourth, *Hendrickson* is solely related to claims for money damages.  But the Tribe here also seeks declaratory and injunctive relief, and Governor Cox is a proper party for that relief.  A

proper party for declaratory or injunctive relief is the person who "would be responsible for ensuring that any … relief is carried out." *Gonzalez v. Feinerman*, 663 F.3d 311, 315 (7th Cir. 2011) (noting that if a plaintiff were solely seeking monetary relief against a defendant who did not participate in prior wrongful decision making, dismissal would be proper, but that dismissal is not proper when injunctive relief is sought. *See also Parkell v. Danberg*, 833 F.3d 313, 332 (3d Cir. 2016); (same holding, citing *Gonzalez*); *Pouncil v. Tilton*, 704 F.3d 568 (9th Cir. 2012) (same holding, citing *Gonzalez*); *Patterson v. MacDougall*, 506 F.2d 1 (5th Cir. 1975) (analogous holding for claims for both declaratory and injunctive relief).

In *Patterson*, prisoners brought suit for declaratory, injunctive, and monetary relief against the Director of the Georgia State Board of Corrections (the Director).  The district court dismissed the suit, holding that plaintiffs had to bring their suit against the warden of the prison in which they were incarcerated.  On appeal, the State supported the district court's analysis and also argued that even if the Director was a proper party, dismissal was proper because the warden was a necessary party.  The Court of Appeals rejected both of the State's arguments, and it reversed the district court order of dismissal.  It held that because the warden is subordinate to the Director, plaintiffs could sue the Director.  The Court also noted that under FRCP 19, the alleged lack of a necessary party would not have supported dismissals.

Fifth, regardless of whether Defendant Cox participated in the wrongful decision to "suspend" the sale and create a false public record regarding the reasons for that "suspension," he knows about it now and knows that the wrongful state action is still **ongoing**, and he is responsible for the ongoing wrong.  It is, in fact, disappointing that the Governor of a state would know about blatant discrimination in sale of property, against a tribe in his own state, and instead of telling his

subordinates to complete the sale as he should have, he has his attorneys seek to continue the wrongful discrimination.

II.    **DIRECTOR STYLER IS A PROPER DEFENDANT.**

Like Governor Cox, Director Styler attempts to re-write the Tribe's complaint to eliminate the Tribe's allegations of specific facts, based upon statements by state agents and state documents, which support the Tribe's allegation that he and DNR were and are neck-deep in the ongoing conspiracy to prevent the sale to the Tribe.  The Tribe discussed DNR's interaction with SITLA prior to the property being offered for sale, which showed that SITLA was ready and eager to sell the land to DNR for millions of dollars **less** than the Tribe bid.  The Tribe also discussed that after SITLA opened the bids, SITLA was surprised to find that the Tribe had substantially outbid DNR. SITLA should have viewed that as a pleasant surprise for SITLA and the trust beneficiaries, but instead, based upon improper discriminatory purposes, SITLA viewed it as a problem which it needed to fix.  DNR then made its sham bid, knowing it did not meet the primary requirement for submitting that bid—the ability to pay the bid, as part of a coordinated and concerted plan to hide the blatant discriminatory conspiracy, and the violation of State and SITLA duties to SITLA's trust beneficiaries.  SITLA then "suspended" the sale based upon what we now know as a pretense.

Styler also copies, in an undeveloped form, Governor Cox's first two errors, discussed above.  His undeveloped argument should be rejected for the reasons discussed above.  In fact, he was more directly responsible than Governor Cox, as it was his department which was actively participating in the conspiracy.

**III.** **DEFENDANTS' ARGUMENTS IN SECTION 3.1 AND 3.2 OF THEIR BRIEFS SHOULD BE DENIED FOR THE SAME REASON THAT SITLA'S SAME ARGUMENTS SHOULD BE DENIED.**

**IV.** **DEFENDANTS' UNDEVELOPED ARGUMENT IN SECTION 3.3 MUST BE REJECTED.**

In Section 3.3, Defendants acknowledge that claims for damages or injunctive relief can be brought against individuals under Title VI.  M. at 30.  But Defendants then make an undeveloped argument that, for some unarticulated reason, the Tribe cannot bring claims against individuals under Title VI.  Their argument is premised on a made-up "quote" from *Shotz v. v. City of Plantation Fla.*, 344 F.3d 1161, 1169-70  M. at 30 (purportedly quoting "because the statute is based upon [Congress's] spending power"…).  *Shotz* does not contain that quote, and neither *Shotz* nor the doctrine that Defendants claim is from *Shotz* has any application to the current suit.

In *Shotz*, the Court held that individuals could be liable for claims for monetary relief for wrongful retaliation under the Americans with Disabilities Act.  The wrong in *Shotz* was a completed wrong, not an ongoing wrong like the present case.  The Court also dismissed a claim of conspiracy against two individuals because, even if the wrongful conspiracy existed, the named individuals had not participated in it and because those defendants could not have remedied the wrong once they did learn of it.

In contrast, the claims in this case are based upon Defendant Stylar and his department participating in the conspiracy, and Defendant Cox failing to exercise power he has to remedy the ongoing wrong.  Section I., *supra*.  If Defendants have an argument for dismissal of those claims, they have not made it in Section 3.3 of their brief, and *Shotz* is inapposite.

**V.** **DEFENDANTS' ARGUMENT FOR DISMISSAL UNDER SECTION 3.4 IS FRIVOLOUS.**

The Tribe alleges discrimination based upon race, national origin, ethnicity, and religion.  It describes in detail that:

Before SITLA offered to sell Tabby Mountain, SITLA

6

- engaged in due diligence to determine that selling the property was in the best interest of the trust beneficiaries, with SITLA's board unanimously concluding that sale of the property was in the best interest of the Trust. Compl. ¶¶53, 57, 79

- set a minimum bid price which was above its own appraisal. Compl ¶60.

- rejected a concern by a State Executive Branch agent that, while sale of the property was in the best interest of the Trust, SITLA was wrongly structing the sale process to improperly seek to sell the land to DNR. Compl. ¶¶62-65.

- was ready to sell the land if DNR had been the high bidder. Compl. ¶¶56, 64, 76

SITLA promptly changed course once it found out the Tribe was the high bidder.

- SITLA and DNR worked in concert to have DNR submit a "higher bid" even though it <u>knew</u> DNR did not meet the primary criteria for making that bid. Compl ¶¶76-94

- SITLA then "suspended" the sale, allegedly to correct issues regarding the advertising period and accuracy of the appraisal—two alleged concerns that it had considered and rejected when it was expecting DNR to submit the high bid. Compl ¶¶93-94

- As the SITLA whistleblower subsequently disclosed, and as was further confirmed by documents the Tribe received from the State, the "suspension" was purely pretextual—SITLA did not take any action to even review either of the pretextual reasons it listed when it suspended the sale. Compl. ¶¶95-101.

In their brief, Defendants do not dispute the Tribe's allegations that it is in a protected class based upon race, national origin, ethnicity, and religion. But they inexplicably assert that solely for the element of wrongful discrimination, the Tribe has not alleged sufficient facts to survive a motion to dismiss.

A. **DISTINCTION BETWEEN EVIDENTIARY STANDARD IN DISCRIMINATION CASES AND PLEADING STANDARD.**

In the words of Justice Neil Gorsuch when still a jurist of this Circuit:

Equal protection is the law's keystone. Without careful attention to equal protection's demands, the integrity of surrounding law all too often erodes, sometimes to the point where it becomes little more than a tool of majoritarian oppression. But when equal protection's demands are met, when majorities are forced to abide the same rules they seek to impose on minorities, we can rest much surer of the soundness of our legal edifice.

*SECSYS, LLC v. Vigil*, 666 F.3d 678, 684 (10th Cir. 2012).

In traditional class-based equal protection jurisprudence, a court "ask[s] whether the challenged state action intentionally discriminates between groups of persons[,]" noting that "intentional discrimination can take several forms." *Id*. One such form is when "generally applicable laws initially enacted with entirely proper (non-discriminatory) purposes themselves later become tools of intentional discrimination in the course of their enforcement. In *Yick Wo v. Hopkins,* 118 U.S. 356 (1886), the paradigmatic example of this line of cases, the Court faced a law barring the operation of commercial laundries in wood buildings without a permit. This generally applicable law would have been perfectly unobjectionable (an attempt to control the fires that plagued San Francisco in the nineteenth century), but for the fact that all two hundred Chinese operators were denied a permit while seventy-nine out of eighty white operators received authorization." *Id*.

Because apparently neutral or legitimate but ultimately pretextual explanation is so often utilized by the discriminatory actor, civil rights plaintiffs are permitted to and often do use circumstantial evidence to prove invidious discrimination. As the Supreme Court of the United States stated in 1977:

> Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. … Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face. The evidentiary inquiry is then relatively easy. But such cases are rare. Absent a pattern as stark as that in *Gomillion* or *Yick Wo*, impact alone is not determinative, and the Court must look to other evidence.

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977) (emphasis added). The Supreme Court listed, "without purporting to be exhaustive, subjects of proper inquiry in determining whether racially discriminatory intent existed":

- "The historical background of the decision…particularly if it reveals a series of official actions taken for invidious purposes."

- "The specific sequence of events leading up to the challenged decision [which] also may shed some light on the decisionmaker's purposes."
- "Departures from the normal procedural sequence"
- "Substantive departures … particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached."
- "The legislative or administrative history…especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Id.*

Federal Rule of Civil Procedure 8(a)(2) requires that the complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." To survive a motion to dismiss and "unlock the doors of discovery," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009):

> a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. . . .
>
> When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Id.* at 663-664. (internal citations and quotations omitted).

In *Ashcroft*, the plaintiff brought a *Bivens* action—the "federal analog to suits brought against state officials under Rev. Stat. § 1979, 42 U.S.C. § 1983." *Id.* at 675 (internal citations and quotations omitted). As such, its analytical lens is particularly helpful here. After the Court identified the applicable elements for a claim of unlawful discrimination, *see id.* at 676-678, it analyzed whether the plaintiff "nudged [his] claims of invidious discrimination across the line from conceivable to plausible" under the lenient pleading standards of FRCP 8(a). *Id.* at 680 (internal citations and quotations omitted). In its analysis, the familiar law regarding a prima facie case and burden shifting related to alleged nondiscriminatory reason are a helpful prism for conducting that analysis, but it must be remembered that the prima facie standard and burden

shifting are evidentiary standards, not pleading standards. *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506 (2002).

Under the evidentiary standard that will apply later in this case, the Tribe can meet its burden through either direct evidence of discrimination or indirect evidence. "A plaintiff alleging discrimination on the basis of race may prove intentional discrimination through either direct evidence of discrimination (e.g., oral or written statements on the part of a defendant showing a discriminatory motivation) **or** indirect (i.e., circumstantial) evidence of discrimination." *Burns v. Bd. of Cnty. Comm'rs of Jackson Cnty.*, 330 F.3d 1275, 1283 (10th Cir. 2003) (citing *Kendrick v. Penske Transp. Servs., Inc.,* 220 F.3d 1220, 1225 (10th Cir.2000) (emphasis added); *Villanueva v. Carere*, 85 F.3d 481, 486 (10th Cir. 1996) ("Although the Parents presented no direct evidence of discriminatory intent, the district court's inquiry could not stop there. 'Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'") (quoting *Arlington Heights*, 429 U.S. at 266).

### B.    APPLICATION OF THE PLEADING STANDARD FOR INTENTIONAL DISCRIMINATION.

Under the pleading standard, which is the applicable standard here, a plaintiff "need not allege facts establishing each element of a prima facie case of discrimination to survive a motion to dismiss." *Taylor v. City of New York*, 207 F. Supp. 3d 293 (citing *EEOC v. Port Auth of N.Y & N.J.*, 768 F.3d 247, 254 (2d Cir. 2013)).

"[I]n making the plausibility determination, the court must be mindful of the "elusive" nature of intentional discrimination. *See Burdine,* 450 U.S. at 255 n. 8, 101 S.Ct. 1089." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86 (2d Cir. 2015)

Defendants Cox and Styler's Motion to Dismiss asserts, in two brief paragraphs (Motion to Dismiss, Section 3.4) that the Tribe has failed to allege invidious discrimination in its Complaint

with respect to its Title VI and Equal Protection claims.  Their argument breezes past (a) the lenient Rule 12(b)(6) standard that must be applied at this pre-discovery, sufficiency-of-the-pleadings stage in litigation, i.e., that the Court must only be looking to whether the Tribe's Complaint contains sufficient factual matter, *accepted as true*, that allows the Court to draw the *reasonable inference* that the defendant is liable for the misconduct alleged—i.e., limiting the Court's inquiry to whether the facts alleged "nudge" the Tribe's claims of invidious discrimination "across the line from conceivable to plausible"; and (b) the long line of Equal Protection and Title VI cases that demonstrate that (i) a plaintiff may plead direct or circumstantial evidence to prove invidious discrimination (and here, the Tribe does both), and (ii) defendants in such cases routinely use pretext to disguise their discriminatory motive, leading courts to develop and adopt burden-shifting schemes designed to enable a civil rights plaintiff to prevail when that discriminatory intent is hidden.  Further, even when delving into the substance of the Tribe's federal civil rights claims, Defendants Cox and Styler misstate the factual standard for invidiousness, which can be proven by direct **or** circumstantial evidence of the conspiratorial actors' discriminatory intent.  The Tribe's Complaint More than Nudges its Equal Protection and Title VI Claims of Invidious Discrimination Across the Line from Conceivable to Plausible

> 1.  **The Tribe's Complaint Alleges Direct <u>and</u> Circumstantial Evidence of Invidious Discrimination, Despite that Only One Form of Evidence is Required**

The Tribe's Complaint easily meets Rule 12(b)(6)'s requirements for pleading invidious discrimination.  Notably, the Tribe's Complaint touches on <u>every single one</u> of the non-exhaustive lists of examples of "circumstantial and direct evidence of intent as may be available" articulated by the Supreme Court in *Vill. of Arlington Heights*, 429 U.S. 252, 268 to successfully prove invidious discrimination.  Specifically, for each of the following:

- "The historical background of the decision…particularly if it reveals a series of official actions taken for invidious purposes."

The Tribe's Complaint discusses the lengthy historical backdrop that contextualizes the Defendants' modern-day perpetuation of discriminatory harm against the now-minority Native American population in Utah through land takings and control. Specifically, at ¶¶ 31-43, the Complaint details how Tabby Mountain was once owned entirely by the Tribe as part of its ancestral and aboriginal homelands. Western non-Indian expansion into Utah to cede the majority of its homelands, and the State now somehow claims it owns the surface estate for Tabby Mountain—a place of special religious significance, sustenance, and reverence to the Tribe and Tribal members. The Complaint explains how these systemic takings of the Tribe's homelands evince unparalleled racial animus, being "the intentional, purposeful, and/or knowing diversion of land from a minority population in order to make that land available for the primary or exclusive benefit of the non-minority population." Tribe's Complaint at ¶ 39. This historical backdrop reveals a "series of official actions taken for invidious purposes," and highlights the extraordinary injustice of government actors first taking land from the Tribe, putting the stolen land up for auction, and then *rejecting the Tribe's bid as the highest bidder on the very land that was stolen*. These factual allegations are just the start of the Tribe's showing that the Defendants' actions cannot be evaluated as anything but intentional continuation of this discriminatory historical backdrop into the modern day.

- "The specific sequence of events leading up to the challenged decision [which] also may shed some light on the decisionmaker's purposes."

In ¶¶ 44-100, the Tribe's Complaint explains the specific sequences of events that sheds light on the Defendants' purposes behind conspiring to suspend the Tabby Mountain sale based on racial animus toward the Tribe. Namely, this section of the Complaint explains how an appraisal was commissioned for the purpose of selling Tabby Mountain, a financial evaluation was

conducted to determine whether selling Tabby Mountain was in the trust beneficiaries' best interests, a proposal for the sale of the property was put forth and unanimously approved as being in the trust beneficiaries' best interests, a lengthy marketing period was considered and rejected, written concerns were raised regarding the marketing period and rejected, a clear procedure was implemented for qualified bidders, the Tribe followed those procedures and won the bid, once it was determined the Tribe won the bid, a conspiracy was hatched to formulate a sham bid in favor of DNR, and the decision was made to suspend the sale based on pretextual concerns (the appraisal and marketing period) that had been specifically raised, considered, and rejected before the property was put for sale—despite the fact that the financial analysis showed that holding onto Tabby Mountain (as in a suspended sale) was not in the beneficiaries' best interests.  This is a telling sequence of events strongly suggesting that the decision not to sell the land to the Tribe was not made based on any legitimate governmental interest but on discriminatory animus toward Native Americans.  Indeed, as this Court stated (under the evidentiary standard) in *Navajo Nation*, this sequence of events "is difficult to explain with reference to any consideration other than race." *Navajo Nation*, 162 F. Supp. 3d at 1183.

- "Departures from the normal procedural sequence."

The Tribe's Complaint details myriad deviations from the typical procedure employed to sell public lands for the trust's benefit.  These abnormalities in the procedural sequence of public land sales show a discriminatory intent to keep the land out of the Tribe's hands, and a conspiracy to ensure the land went to another state agency, despite that it hadn't won the bid and did not possess the requisite funds to lawfully purchase the land.  These include: the lobbying of the state legislature for money so that DNR could out-bid the Tribe after the Tribe had already won the bid, giving a bidder who had already bid and lost (and only that specific bidder) an opportunity to exceed the winning bid, communicating the same to the true winning bidder (the Tribe), the

suspension of the sale after a bidder had won according to the prescribed procedural process and despite that a suspension would be detrimental to the trust beneficiaries, the creation of a false public record to create a pretextual reason for the suspension, and failing to remedy the pretextual reasons put forth for the sale's suspension (i.e., by commissioning a new appraisal and re-marketing the property with a longer marketing period) after the suspension was publicly announced (to name a few).  Tribe's Complaint at ¶¶ 79, 82, 83, 88, 92, 95, 98-100.

- "Substantive departures…particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached."

The Tribe's Complaint details substantive departures from the normal public land sale process that are related to and intertwined with the procedural abnormalities referenced above. These substantive departures from normal governmental decision-making and process further bolster a finding that the Defendants acted in a conspiratorial scheme motivated by racist intent to keep Tabby Mountain out of the hands of the Indians.  These include a government entity (DNR) submitting an initial bid for Tabby Mountain that it did not have the funding to satisfy and disclosing that fact in its bid, deciding not to contact the winning bidder, government actors conspiring to thwart a sale that would benefit the trust beneficiaries, publicly giving a losing bidder an opportunity to outbid the winner even when it was known there were not sufficient funds to satisfy the increased bid, publicly giving a losing bidder 24-hours to counter the winning bid, the submission of an increased bid not supported by adequate funding, and deciding to suspend the sale indefinitely after a sham bid was submitted (to name a few).  Tribe's Complaint at ¶¶ 73, 78, 79, 83, 84, 85, 86, 92.

Perhaps most telling of these substantive deviations is that a "factor[] usually considered important by the decisionmaker strongly favor[ed] a decision contrary to the one reached."

Specifically, the Tribe's Complaint at ¶ 53 describes how, before Tabby Mountain was placed for sale, a financial analysis was conducted that compared the relative financial benefit of a sale of Tabby Mountain for $41,000,000.00 with its present-day income value of $3,240,000.00. The analysis "concluded that in Fiscal Year 2019, [SITLA] would distribute only $9,501.20 to trust beneficiaries if it continued to own the surface estate at Tabby Mountain, but would distribute $1,640,000.00 to the beneficiaries if it sold the land for $41,000,000.00. The estimated distribution to public schools was $5,961.18 if it owned the land, but $1,361,200.00 if it sold the land." Tribe's Complaint at ¶ 54. Thus, "[s]elling the land was in the best interest of the Trust and the trust beneficiaries." Tribe's Complaint at ¶ 55.

In administrative proceedings highlighted in *Nat'l Parks & Conservation Ass'n I*,[1] the Director of SITLA's predecessor, the Division of State Lands and Forestry ("Division"), held the following with respect to the Division's fiduciary duties:

> the Division could not give priority to nonmonetary values…because of its fiduciary duty to manage school trust land for the exclusive economic benefit of the common schools … the objective of supporting the public schools could not be subordinated to the pursuit of other values on the land impressed with the trust. …
>
> To the extent that preservation of non-economic values does not constitute a diversion of trust assets or resources, such an activity may be prudently undertaken. To the extent that ... the protection of non-economic values is necessary for maximizing the economic value of the property, such protection may be prudently undertaken. When such preservation or protection results in a diversion of assets or loss of economic opportunity, a breach of duty is indicated."[2]

This excerpt summarizes the undisputable fact that SITLA may not, by law, prioritize any other interest above its duty to maximize monetary return to the trust beneficiaries. Yet, as alleged in the Tribe's Complaint, a decision was made to suspend the Tabby Mountain sale after the Tribe

---

[1] *Nat'l Parks & Conservation Ass'n v. Bd. of State Lands*, 869 P.2d 909, 916–19 (Utah 1993) ("*Nat'l Parks & Conservation Ass'n I*").

[2] *Id*. at 916.

had won the bid and agreed to pay not just $41,000,000.00 but *$46,976,000.00* to the trust—an occurrence that had been analyzed and concluded to return a far larger return to the trust beneficiaries than holding the illiquid land.  Tribe's Complaint at ¶ 72.  Even more tellingly, the Tribe's Complaint alleges that when DNR submitted its lower bid of $41,000,000.00, it admitted that it didn't even have the funding to satisfy it, making the Tribe the only true qualified bidder in the sale of Tabby Mountain.  Tribe's Complaint at ¶ 73.  Thus, the conspiratorial actors acted contrary to a factor not only "considered important by the decisionmaker[s]" but that was <u>fiduciarily mandated</u> to be considered <u>paramount</u> by the decision makers—and which "strongly favor[ed] a decision contrary to the one reached."  Once again, like the decision not to redraw District Three in *Navajo Nation*, the decision to suspend the sale in violation of maximizing monetary return to the trust and in violation of fiduciary duties owed to the trust "is difficult to explain with reference to any consideration other than race."  *Navajo Nation*, 162 F. Supp. 3d at 1183.

- "The legislative or administrative history…especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports."  *Id*.

Finally, the Tribe's Complaint also cites the administrative history created by the Defendants which does not show just circumstantial but <u>direct</u> evidence of discriminatory intent.  Specifically, at ¶ 77, the Tribe's Complaint states that "[o]n February 19, 2019, at a meeting of the Land Trust Protection and Advocacy Committee, committee members expressed concerns that if the Tribe owned Tabby Mountain, *Indians would control access to the land* and could prevent non-Indians from accessing the land."  (Emphasis added).  Accepting these factual allegations as true, and in addition to the administrative record which circumstantially shows a conspiratorial intent to keep the land out of the hands of the Indians (e.g., Tribe's Complaint at ¶¶ 50 (confidential

16

broker price opinion),  51 (bid invitation issuance), 52 (appraisal letter of engagement), 57 (unanimous vote of administrative body that selling land in trust's best interests), 58 (administrative record reflecting "political" issues surrounding the sale), 60 (public notice of sale), 62 (memorandum from school trust stakeholder expressing concern that the proposed sale was rigged in favor of DNR), 67 (mailing of binding bidding procedures), 72 (Tribe's compliant winning bid submitted), 73 (DNR's losing bid indicating it wasn't supported by sufficient funds), 86 (DNR's submission of sham $50,000,000.00 bid), 93 (press release suspending sale)) there is no doubt that the Tribe has not just "nudged" but definitively placed its "claims of invidious discrimination across the line from conceivable to plausible" under the lenient pleading standards of FRCP 8(a) and, at this pre-discovery stage, Rule 12(b)(6).  *Ashcroft*, 556 U.S. at 680.

## VI.   THE TRIBE HAS PLEADED WITH PARTICULARITY SUFFICIENT FACTS SUPPORTING ITS CLAIMS FOR FRAUD AND FRAUD CONSPIRACY COMMITTED BY DEFENDANTS COX AND STYLER

Defendants Cox and Styler assert that the Tribe has failed to plead sufficient facts supporting allegations of fraud and conspiracy to commit fraud against them.  Motion to Dismiss at 4.4 (incorporating SITLA's arguments on these points).  FRCP 8(a)(2) only requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."   FRCP 9(b) provides that "a party must state with particularity the circumstances constituting fraud .…  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  At the Motion to Dismiss stage, Rule 12(b)(6)'s lenient plausibility standards, discussed herein, govern with respect to the Tribe's allegations of fraud and conspiracy.

### A.   FRAUD

In Utah, "[t]he elements that a party must allege to bring a claim sounding in fraud are (1) that a representation was made (2) concerning a presently existing material fact (3) which was false and (4) which the representor either (a) knew to be false or (b) made recklessly, knowing that

there was insufficient knowledge upon which to base such a representation, (5) for the purpose of inducing the other party to act upon it and (6) that the other party, acting reasonably and in ignorance of its falsity, (7) did in fact rely upon it (8) and was thereby induced to act (9) to that party's injury and damage." *Armed Forces Ins. Exch. v. Harrison*, 2003 UT 14, ¶ 16, 70 P.3d 35, 40 (internal citations and quotations omitted).

The Tribes Complaint alleges each of these elements with particularity. Specifically, for each of the following:

- "that a representation was made [] concerning a presently existing material fact [] which was false[;]"

The Tribe's Complaint at ¶¶ 83, 84, 88, 92, 93, 94, 95, 96, 97, 98, 99, 100, 105, and 106 alleges several representations concerning existing material facts, and support that they were false, including that (i) DNR's opportunity to counter the Tribe's bid after the Tribe had won was legal, legitimate, and not a sham, (ii) SITLA's suspension of the sale after receiving DNR's sham bid was based on a legitimate bid that successfully countered the Tribe's winning bid, (iii) the sale was suspended because of DNR's higher bid which was legal and supported by adequate funds; (iv) the suspension would be temporary; (v) the reason for the suspension was for SITLA to address the trust beneficiaries' concerns regarding the accuracy of the appraisal and the length of time that the property was advertised when those exact concerns had been rejected and were not pursued further after the sale was suspended; (vi) that the sale was suspended and therefore no underhanded methodologies would be used to transfer Tabby Mountain outside the public sale process; (vii) that the Tribe would be contacted when the sale suspension ended or the land sale otherwise proceeded with further action; and (viii) that no non-legitimate consideration went into the decision to suspend the Tabby Mountain sale.

18

- "and which the representor either (a) knew to be false or (b) made recklessly, knowing that there was insufficient knowledge upon which to base such a representation[;]"

The Tribe's Complaint at ¶¶ 3, 76, 82, 84, 88, 90, 91, 93, 97, 98, 101, 111, 143, 167, 168, 169, 170, and 171 alleges that the Defendants knew the representations they were making with respect to the Tabby Mountain sale (described above) were false (or else, these factual allegations create the inference that the Defendants made them recklessly), satisfying FRCP 9(b)'s general allegation standard for mental states.

- "for the purpose of inducing the other party to act upon it[;]"

The Tribe's Complaint at ¶¶ 169 and 170 describes how the false representations made by the Defendants were designed to deter the Tribe from enforcing the terms of the bidding sale it had plainly won as the only legitimate and highest bidder.  The Tribe's Complaint, taken as a whole, also makes clear that the Tribe was repeatedly lied to, misled, and made to be held in a state of suspension regarding an almost $47,000,000.00 purchase, all for the purpose of ensuring the land would not make it into the hands of the Indians.

- "and that the other party, acting reasonably and in ignorance of its falsity[;]"

The Tribe's Complaint describes how the Defendants' conspiratorial scheme was designed to trick the Tribe and did in fact trick the Tribe.  For example, at ¶ 93, the Complaint states that "[o]n February 22, 2019, SITLA issued a press release, providing public notice that it had voted to 'temporarily suspend proceedings on a proposed sale.'   SITLA Director Ure sent a letter informing the Tribe that SITLA's Board of Trustees voted to suspend the proposed sale, and falsely stating that the reason for the suspension was for SITLA to address the trust beneficiaries' concerns regarding the accuracy of the appraisal and the length of time that the property was advertised."

19

The press release, issued publicly, and the letter sent directly to the Tribe, caused the Tribe to act reasonably, waiting for the promised sale to come to fruition, and in ignorance of the false reasons put forth by the Defendants as to why the sale was suspended.  *See also*, ¶ 101 ("No Defendant disclosed to the Tribe or the public that DNR's bid was a sham, nor did they disclose to the Tribe or the public that their public assertion that they were only temporarily suspending the sale was false, nor did they disclose to the Tribe or the public that SITLA had rejected sale to the Tribe in violation of its trust obligations and in violation of anti-discrimination laws.")

- "did in fact rely upon it [] and was thereby induced to act[;]"

The Tribe's Complaint at ¶ 97 describes how communication to the Tribe after the suspension indicated that the Tribe would be contacted "when [SITLA] determines to move forward with further action."  The Tribe has been relying on this false assertion—and the other false assertions described above—ever since the sale was suspended.  It was not until a whistleblower who had personally witnessed the scheme play out came forth in 2022 (Tribe's Complaint at ¶ 105) that the Tribe finally understood the true reason for the sale's suspension.

- "to that party's injury and damage[.]"

Finally, the Tribe's Complaint at ¶¶ 23, 24, 25, 26, 27, 28, 29, 30, 41, 42, 43, 112, 113, 114, 115, 116, 144, 145, 146, and 171 describe how the Tribe lost something even beyond and in addition to monetary damages as a result of the fraudulent scheme to deprive it of its aboriginal homelands.  It lost the irreplaceable opportunity to practice its religious and spiritual beliefs at Tabby Mountain, to hunt, forage, and collect natural resources at Tabby Mountain, and the unique reality itself.  It lost the opportunity to unite the mineral estate—which it owns—with the surface estate, which it fairly purchased—but for the Defendants' racist scheme to prevent that reunification.  It also lost the opportunity to add a parcel of land—teaming with life—to its

communally held resources, held in trust by the United States and designed to benefit all Tribal members equally.

### B.   FRAUD CONSPIRACY

In Utah, "[t]o prove a civil conspiracy, plaintiff must show the following elements: (1) a combination of two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages as a proximate result thereof." *Israel Pagan Est. v. Cannon*, 746 P.2d 785, 790 (Utah Ct. App. 1987).

The Tribe's Complaint alleges each of these elements with particularity.  Specifically, for each of the following:

- "a combination of two or more persons[;]"

The Tribe's Complaint at ¶ 2 alleges that multiple "State of Utah…officers and SITLA officers," upon learning that the Tribe had won the bid, "did not want to sell the land to Indians, and they immediately began working behind the scenes to try to figure out a way to stop the sale to Indians."  The Tribe's Complaint at ¶ 3 alleges that all named Defendants, including Defendants Cox and Styler, "worked together to concoct a public record to hide their discrimination based upon race, ethnicity, national origin, and religion. … SITLA, DNR, and others who were in on the conspiracy knew DNR's bid was a sham, because DNR did not have sufficient money to meet the required and primary bidding condition—that the bidder could pay the amount bid."  Paragraphs 4 and 105 explain how a whistleblower came forward in 2022 and confirmed that all Defendants named in the Tribe's Complaint (i.e., a combination of two or more persons) were in on the conspiracy.

- "an object to be accomplished[;]"

The Tribe's Complaint at ¶¶ 2 and 3 alleges that the object of the Defendants' conspiracy was to keep Tabby Mountain out of the hands of the highest and only legitimate bidder because

they were Indians.  Paragraphs 56, 64, 73, 79, 96, and 108 allege that the correlative object was to ensure DNR got the land, such that it remained in state possession, regardless of whether the transfer to DNR would be supported by adequate consideration and regardless of whether it was in the trust beneficiaries' best interests.

- "a meeting of the minds on the object or course of action;"

For this element of conspiracy, "it is not necessary…to prove that the parties actually came together and entered into a formal agreement to do the acts complained of by direct evidence. Instead, conspiracy may be inferred from circumstantial evidence, including the nature of the act done, the relations of the parties, and the interests of the alleged conspirators." *Israel Pagan Est. v. Cannon*, 746 P.2d 785, 791 (Utah Ct. App. 1987) (internal citations omitted).  The Tribe's Complaint, taken as a whole, and in particular at ¶¶ 2, 3, 13, 15, 51, 52, 56, 64, 73, 76, 79, 80, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 96, 97, 102, 107, 108, 166, and 169, create the strong inference that the Defendants—as soon as they figured out who the high bidder was—met in mind to create a scheme, reaching up to the highest levels of state government, designed to keep Tabby Mountain out of the hands of the Indians.  Confirming this strong inference created by circumstantial evidence is the direct evidence of this fact alleged in ¶¶ 4 and 105, which explains how, in 2022, a whistleblower came forward who confirmed that there was a meeting of the minds to conspire against the Tribe from acquiring Tabby Mountain.  This whistleblower was a witness to the events alleged in the Tribe's complaint, and, "[o]n August 30, 2022, … filed a formal complaint alleging that the bid sale was rigged from the beginning to prevent the Tribe from acquiring Tabby Mountain."  Tribe's Complaint at ¶ 105.  The Tribe's Complaint at ¶ 106 alleges that the next day, "[o]n August 31, 2022, the Utah Land Trust Protection and Advocacy Office, retaliated against

[whistleblower] by firing him," further solidifying that there was indeed a meeting of the minds which he had exposed.

- "one or more unlawful, overt acts[;]"

For conspiracy to commit fraud, the unlawful act is fraud. The occurrence of that unlawful act is pled sufficiently in the Tribe's Complaint, as explained above.

- "and damages as a proximate result thereof."

Finally, the Tribe's Complaint at ¶¶ 23, 24, 25, 26, 27, 28, 29, 30, 41, 42, 43, 112, 113, 114, 115, 116, 144, 145, 146, and 171 describe how the Tribe lost something even beyond and in addition to monetary damages as a result of the conspiratorial scheme to deprive it of its aboriginal homelands. It lost the irreplaceable opportunity to practice its religious and spiritual beliefs at Tabby Mountain, to hunt, forage, and collect natural resources at Tabby Mountain, and the unique realty itself. It lost the opportunity to unite the mineral estate—which it owns—with the surface estate, which it fairly purchased—but for the Defendants' racist scheme to prevent that reunification. It also lost the opportunity to add a parcel of land—teaming with life—to its communally held resources, held in trust by the United States and designed to benefit all Tribal members equally.

VII.    **DEFENDANTS' UNCLEAR ARGUMENT FOR DISMISSAL OF STATE LAW CLAIMS SHOULD BE DENIED FOR REASONS DISCUSSED IN THE TRIBE'S RESPONSE TO DEFENDANT URE.**

## CONCLUSION

Defendants Cox and Styler fail to grapple with the fact that the Tribe has pled claims that all of the Defendants have participated in a conspiracy. As with any conspiracy, all participants are liable for the acts of the conspiracy. Most notably, Defendant Cox attempts to escape liability for his ongoing failure to exercise his power to remedy the ongoing wrong, attempting to hide behind a claim that it happened on someone else's watch. It is happening on his watch. He can

do something about it, but instead is having his attorneys try to evade the consequences of the ongoing discrimination.

Defendants' motion to dismiss should be denied.

Dated: October 16, 2023.

<div style="margin-left: 40%;">

PATTERSON EARNHART REAL BIRD & WILSON LLP

*/s/ Michelle E. Long*
Michelle E. Long
1900 Plaza Drive
Louisville, Colorado 80027
Phone:  (303) 926.5292
Facsimile:  (303) 926.5293
Email: mlong@nativelawgroup.com

J. PRESTON STIEFF LAW OFFICES, LLC

*/s/ J. Preston Stieff*
J. Preston Stieff (4764)
110 South Regent Street, Suite 200
Salt Lake City, Utah  84111
Telephone:  (801) 366-6002
Email: jps@StieffLaw.com

*Counsel for Plaintiff*

</div>