THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| UTE INDIAN TRIBE OF THE UINTAH AND OURAY INDIAN RESERVATION, a federally recognized Indian Tribe, <br><br> Plaintiff, <br><br> v. <br><br> DAVID URE, MICHELLE MCCONKIE, MICHAEL STYLER, SPENCER COX, UTAH SCHOOL AND INSTITUTIONAL TRUST LANDS ADMINISTRATION, <br><br> Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS** <br><br> Case No. 2:23-cv-00295-DBB-JCB <br><br> District Judge David Barlow |

Before the court are the Defendants' Motions to Dismiss.[1] The Ute Indian Tribe of the Uintah and Ouray Reservation (the "Tribe") filed their Complaint on May 5, 2023.[2] Defendants Spencer Cox, the Governor of the State of Utah; Michael Styler, the former Executive Director of the Utah Natural Resources; the Utah School and Institutional Trust Lands Administration ("SITLA"); Michelle McConkie, the current Director of SITLA; and David Ure, the former Director of SITLA, move to dismiss the Ute Indian Tribe of the Uintah and Ouray Reservation's (the "Tribe") Complaint under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.[3]

**BACKGROUND**

---

[1] David Ure's Mot. to Dismiss Compl. ("Ure MTD"), ECF No. 17, filed Aug. 28, 2023; Utah School and Institutional Trust Lands Administration and Michelle McConkie's Motion to Dismiss Compl. ("SITLA/McConkie MTD"), ECF No. 23, filed Aug. 28, 2023; Spencer Cox and Michael Styler's Motion to Dismiss Compl. ("Cox/Styler MTD"), ECF No. 25, filed Aug. 28, 2023.
[2] Compl., ECF No. 1, filed May 5, 2023.
[3] *Id.*

The Utah School and Institutional Trust Administration ("SITLA") is an independent agency that manages lands that the federal government granted to Utah for the support of its schools and other programs.[4] The land is held in trust for the exclusive benefit of trust beneficiaries.[5] The revenue generated from the land is deposited into a general fund and money is distributed from the fund to the schools.[6] Among the possible sources of revenue generated by trust assets is the outright sale of trust land. Doing so requires the trustee, SITLA, to carefully balance the needs of current beneficiaries and the preservation of assets for future beneficiaries.[7]

In December 2018, SITLA issued a public notice that it planned to sell surface rights to property known as Tabby Mountain.[8] Tabby Mountain has special importance to the Ute Indian Tribe of the Uintah and Ouray Reservation ("Tribe"). It is within the Tribe's "ancestral and aboriginal lands and within the exterior boundaries of the Uintah Valley Reservation."[9] The land within the original boundaries of the Uintah Valley Reservation, including Tabby Mountain, has been whittled down by acts of Congress through a process known as allotment.[10] In 1956, the United States reserved for the Tribe the mineral estate for some parcels on Tabby Mountain.[11] However, the surface rights were granted to Utah as trust lands.[12] These trust lands are at the center of the dispute.

---

[4] Utah Code Ann. § 53C-1-102(a)–(b) (Westlaw through 2023 2nd Spec. Legis. Sess.).
[5] § 53C-1-102(2).
[6] § 53D-1-102(10).
[7] *Id.*
[8] Compl. ¶ 60. For purposes of these motions to dismiss, the court treats all well-pled factual allegations in the Complaint as true.
[9] *Id.* ¶ 31.
[10] *Id.* ¶ 36.
[11] *Id.* ¶ 41.
[12] *Id.* ¶ 42.

The Tribe submitted a bid for the surface rights in February 2019.[13] The Utah Department of Natural Resources ("DNR") submitted a bid around the same time.[14] SITLA then invited DNR to submit a revised bid, which was submitted later that month.[15] On February 22, 2019, SITLA announced that it had voted to suspend the Tabby Mountain sale.[16] The former Director of SITLA, David Ure, told the Tribe that SITLA's Board of Trustees voted to suspend the sale because of concerns over the appraisal calculation and the relatively short period that the sale was advertised.[17] He stated that SITLA would reach out "when it determines to move forward with further action."[18] As of the date of the complaint, SITLA continues to hold the sale in a suspended state.[19]

On February 26, 2019, Ute Indian Tribe Chairman Luke Duncan sent a letter to Director Ure expressing the Tribe's concerns regarding procedural irregularities in SITLA's sale of Tabby Mountain.[20] Chairman Duncan demanded that SITLA honor the Tribe's offer to purchase the property pursuant to SITLA procedure.[21]

On August 31, 2022, two-and-a-half years after the suspension of the sale, Tim Donaldson, Director of the Utah Land Trust Protection and Advocacy Office, filed a formal complaint alleging that SITLA purposefully suspended the sale to prevent the Tribe from purchasing Tabby Mountain.[22]

---

[13] Compl. ¶ 72.
[14] *Id.* ¶ 73.
[15] *Id.* ¶ 15.
[16] *Id.* ¶ 93.
[17] *Id.* ¶ 93.
[18] *Id.* ¶ 97.
[19] *Id.* ¶ 18.
[20] *Id.* ¶ 104.
[21] *Id.* ¶ 104.
[22] *Id.* ¶ 105.

On August 28, 2023, the Tribe filed suit against SITLA, former SITLA Director David Ure, current SITLA Director Michelle McConkie, former DNR Director Michael Styler, and Utah Governor Spencer Cox. The Complaint alleges that SITLA's valuation of Tabby Mountain demonstrated selling the land above the minimum bid price would far exceed the present value of all income generated from the property.[23] The Tribe originally submitted the highest offer, but according to the Complaint, SITLA allowed DNR to revise its bid so that it could exceed the Tribe's.[24] The Complaint states that DNR's bid was contingent on obtaining funding from the state legislature, which fell through in February 2019.[25] Once it became clear that DNR could not obtain the money for its bid, Governor Cox, SITLA Director Ure, and DNR Director Styler allegedly agreed to suspend the bid to prevent the Tribe from obtaining Tabby Mountain to ensure that DNR's bid succeeded.[26] The sale was suspended even though selling the land to the Tribe was purportedly in the trust beneficiaries' best interest.[27] SITLA has yet to issue a final decision and continues to hold the sale in a suspended state.[28]

The Tribe brings claims against the Defendants under 42 U.S.C. §§ 1981, 1982, 1983, 1985, and 2000d ("Civil Rights Acts") in asserting that Defendants violated their constitutional rights. The complaint alleges that Defendants suspended the sale because of the Tribe's race, national origin, ethnicity, and religion in violation of the Tribe's Due Process and Equal Protection rights.[29] The Tribe also asserts fraud, collateral estoppel, equitable conversion, breach of fiduciary duties, and breach of contract claims against Defendants.[30]

---

[23] Compl. ¶ 53.
[24] *Id.* ¶ 79.
[25] *Id.*
[26] *Id.* ¶ 80.
[27] *Id.* ¶ 81.
[28] *Id.* ¶ 108.
[29] *Id.* ¶ 132.
[30] *Id.* ¶¶ 152–83.

Defendants seek to dismiss Plaintiff's state law claims under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction.[31] Defendants raise their remaining arguments under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

## STANDARD

To withstand a motion to dismiss under Rule 12(b)(6), a complaint must have "enough allegations of fact, taken as true, 'to state a claim to relief that is plausible on its face.'"[32] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[33] In reviewing the pleadings, the court accepts as true the well-pleaded factual allegations, drawing all reasonable inferences in favor of the plaintiff.[34] Conclusory statements and legal conclusions are not afforded this deferential standard.[35] "[A] plaintiff must offer specific factual allegations to support each claim."[36]

There are two forms of challenges to subject matter jurisdiction under Rule 12(b)(1). When considering a facial attack to subject matter jurisdiction, factual allegations in the complaint are accepted as true and the allegations are construed in the light most favorable to the plaintiff.[37] Under a factual challenge, a complaint's factual allegations are not given the presumption of truth and the court can consider additional evidence to resolve disputed

---

[31] Ure MTD 11; SITLA/McConkie MTD 1, 10; Cox/Styler MTD 10–11.
[32] *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007).
[33] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).
[34] *E.g., Wilson v. Montano*, 715 F.3d 847, 852 (10th Cir. 2013).
[35] *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009); *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).
[36] *Kans. Penn Gaming*, 656 F.3d at 1214.
[37] *Muscogee (Creek) Nation v. Okla. Tax Comm'n*, 611 F.3d 1222, 1227 n.1 (10th Cir. 2010).

jurisdictional facts.[38] The court can do so without having to convert the motion to dismiss into a motion for summary judgment.[39]

## DISCUSSION

### I.   Federal Claims

As to the Tribe's federal claims, Defendants raise four central arguments: the Tribe lacks standing to sue under the Civil Rights Acts,[40] Defendants are protected by sovereign immunity,[41] the Tribe's claims are barred by the statute of limitations,[42] and the Complaint failed to satisfy the pleading standard under Rule 8 of the Federal Rules of Civil Procedure.[43]

#### A.   The Tribe's Standing Under Civil Rights Acts

Defendants challenge the Tribe's standing to bring its constitutional claims under 42 U.S.C. §§ 1981, 1982, 1983, and 1985.[44] The Complaint states that the Tribe can bring its "cause of action on its own behalf" as a "person" under § 1983 or that it has *parents patriae* standing "because the tribe represents the interests of all of its members and raises claims which affect all of its members."[45]

Each of these statutes protects the rights of "persons" or "citizens."[46] Defendants assert that a sovereign, such as a tribe, is not a "person[]" or "citizen[]" under the statutes. This question has only been addressed within the context of § 1983 but not the other statutes. However, it is assumed that the terms "persons" or "citizens" have consistent meaning within the

---

[38] *Graff v. Aberdeen Ents., II, Inc.*, 65 F.4th 500, 507 (10th Cir. 2023).
[39] *Id.*
[40] Ure MTD 4; SITLA/McConkie MTD 4; Cox/Styler MTD 23.
[41] Ure MTD 6; SITLA/McConkie MTD 7–9; Cox/Styler MTD 16–17, 20–21.
[42] SITLA/McConkie MTD 21; Cox/Styler MTD 22.
[43] Ure MTD 7; SITLA/McConkie MTD 7; Cox/Styler MTD 13–20, 25.
[44] Ure MTD 4; SITLA/McConkie MTD 4; Cox/Styler MTD 23.
[45] Compl. ¶ 9.
[46] *See* 42 U.S.C. § 1981 ("All persons"); 42 U.S.C. § 1982 ("All citizens"); 42 U.S.C. § 1983 ("any citizen of the United States or other person"); 42 U.S.C. § 1985 ("any person"); 42 U.S.C. § 2000d ("No person").

Civil Rights Acts of 1866 and 1871, which as codified include each of the statutes in question.[47]

Thus, if the Tribe has standing under § 1983, it has standing under the other statutes and vice

versa.

"Section 1983 permits 'citizens' and 'other person[s] within the jurisdiction' of the

United States to seek legal and equitable relief from 'person[s]' who, under the color of state

law, deprive them of federally protected rights."[48] A claim under § 1983 can only be brought by

a "citizen" or "person."[49] The Supreme Court has held that the term "person" under the Act does

not normally include sovereigns.[50] However, "qualification of a sovereign as a 'person' who may

maintain a particular claim for relief depends not 'upon a bare analysis of the word 'person,' but

on the 'legislative environment' in which the word appears.[51] "In enacting § 1983, the Court

said, 'Congress did not intend to override well-established immunities or defenses under the

common law,' including '[t]he doctrine of sovereign immunity.'"[52] However, "[a] tribe may or

may not qualify as a "'person,' 'depend[ing] on whether the tribe's asserted right [is] of a

sovereign nature.'"[53]

In *Inyo County v. Paiute-Shoshone Indians*, the Supreme Court held that a tribe asserting

a right to be free from a state's criminal process could not bring a claim under the act because

"section 1983 was designed to secure private rights against government encroachment, not to

---

[47] "[T]here is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning." *Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932). The Civil Rights Act of 1866 and 1871 as codified, include 42 U.S.C. §§ 1981, 1982, 1983, and 1985. *See Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 468 U.S. 375 (1982) (discussing the history of the Civil Rights Acts). Identical words in these acts should be interpreted to have the same meaning.
[48] *Id.* at 1234 (quoting 42 U.S.C. § 1983).
[49] 42 U.S.C. § 1983.
[50] *See Will v. Mich. Dept. of State Police*, 491 U.S. 58 (1989).
[51] *Inyo Cnty. v. Paiute-Shoshone Indians*, 538 U.S. 701, 711 (2003).
[52] *Inyo Cnty.*, 538 U.S. at 709 (quoting *Will*, 491 U.S. at 67).
[53] *Becker v. Ute Indian Tribe of the Uintah and Ouray Res.*, 868 F.3d 1199, 1205 (10th Cir. 2017) (quoting *Inyo County v. Paiute-Shoshone Indians*, 538 U.S. 701, 711 (2003)); *Muscogee (Creek) Nation v. Okla. Tax Com'n*, 611 F.3d 1222, 1235 (10th Cir. 2010) (quoting *Inyo Cnty.*, 538 U.S. at 711)).

advance a sovereign's prerogative to withhold evidence relevant to a criminal investigation."[54] The holding was limited to the facts of the case: "the Tribe may not sue under § 1983 to vindicate the sovereign right it here claims."[55]

In explaining the Court's reasoning, *Inyo County* provided a few circumstances in which a sovereign has been allowed to assert similar claims under different statutes.[56] The Court cited *Georgia v. Evans*,[57] a case where "a State, as purchaser of asphalt shipped in interstate commerce, qualified as a 'person' entitled to seek redress under the Sherman Act for restraint of trade."[58] It also cited *Pfizer, Inc. v. Government of India,* which "held that a foreign nation, as purchaser of antibiotics, ranked as a 'person' qualified to sue pharmaceuticals manufacturers under our antitrust laws."[59] Thus, the Court has recognized some limited instances in which a sovereign may be permitted to assert claims normally limited to only "private person[s]."[60]

In evaluating *Inyo County*, the Tenth Circuit has held that "an Indian tribe's status as a sovereign entity did not *per se* foreclose its ability to bring a suit as a 'person' under § 1983."[61] Where a tribal government's asserted right is not of a sovereign nature, the tribe may have standing to sue under the Act.[62] Two Tenth Circuit decisions help define the contours of what "of a sovereign nature" means. First, when a tribe asserted that it had "due process rights 'to not be subjected to unlawful claims of State authority,'" the Tenth Circuit held in *Becker v. Ute Indian Tribe of the Uintah and Ouray Reservation*, that the tribe asserted "the right of tribal

---

[54] 538 U.S. 701, 712.
[55] *Id.*
[56] *Id.* at 711. *See also Skokomish Indian Tribe v. United States*, 410 F.3d 506, 514 (9th Cir. 2005) (analyzing *Inyo Cnty.*).
[57] *Inyo Cnty.,* 538 U.S. at 711 (*Georgia v. Evans,* 316 U.S. 159, 160–63 (1942)).
[58] *Id.*
[59] *Id.* (citing *Pfizer, Inc. v. Gov't of India,* 434 U.S. 308, 309–20 (1978)).
[60] *See Skokomish*, 410 F.3d at 514.
[61] *Muskogee (Creek) Nation v. Okla. Tax Comm'n*, 611 F.3d 1222, 1235 (10th Cir. 2010).
[62] *Id.* at 234.

sovereignty."[63] In another case, *Muscogee (Creek) Nation v. Oklahoma Tax Commission*, a tribe challenged a state's authority to enforce a cigarette taxation scheme through searches and seizures because doing so interfered with "'Indian commerce.'"[64] The Tenth Circuit reasoned that this was a sovereign interest in part because "[n]o exemption from the state's statutory scheme based on Indian commerce would be available to [the tribe] suing as a non-sovereign 'person.'"[65] The court also reasoned that the complaint referred "on multiple occasions" to its sovereign status in its complaint, which sought to "vindicate the [tribe's] status as a sovereign immune" from the state's taxation scheme.[66]

The issue is two-part: (1) which rights are being asserted by the Complaint, and (2) whether those rights can be asserted by an individual under § 1983. Defendants contend that the Tribe's interest in the dispute is exclusively sovereign because the land it sought to purchase would only be held by the Tribal entity itself, not the individual private Tribal members.[67] The Tribe responds that the fact it asserts its § 1983 claim as a sovereign is not fatal. Rather, focus should be placed on the nature of "the right asserted . . . not whether the Tribe is a sovereign."[68]

Critical to the analysis is a close review of the Complaint. The Complaint asserts the right "to be free from discrimination when seeking to purchase real property."[69] Unlike the cases discussed in this section, the Complaint does not assert that the Tribe's interest in the suit derives from a sovereign right, nor does it assert a sovereign right directly. For example, it is not asserting a right against a state government to not be taxed or to recognize rights contained in a

---

[63] *Becker v. Ute Indian Tribe of the Uintah and Ouray Rsrv.*, 868 F.3d 1199, 1202, 1206 (10th Cir. 2017) (quoting Aplt. Br. at 21).
[64] *Muskogee (Creek) Nation*, 611 F.3d at 1235 (quoting Aplt. Br.).
[65] *Id.*
[66] *Id.* at 1235–36.
[67] Director Ure's Reply Mem. in Supp. of Mot. to Dismiss 6, ECF No. 47, filed Nov. 6, 2023.
[68] Resp. in Opp. to Director Ure's Mot. to Dismiss 3, ECF No. 38, filed Oct. 16, 2023.
[69] *Id.* at 2.

treaty. Just because the entity in question is a tribe does not necessarily mean that the interest it pursues is sovereign in nature. And even though sovereign interests may be implicated if the sale were to be finalized, the issue here is not whether the Tribe has title to the land as a sovereign, it is whether the Tribe's "asserted right was of a sovereign nature."[70] Here, the Complaint asserts that SITLA's bidding process for Tabby Mountain involved discrimination against the Tribe "based on race, national origin, ethnicity, and religion."[71] Because an individual could bring a claim on this basis, the Tribe qualifies as a "person" who can bring claims under § 1983.

Defendants also argue that *Becker* stands for the proposition that a tribe cannot bring claims under § 1983 if it pleads that it is acting as a sovereign.[72] Thus, because the Complaint states that the Tribe is acting as a sovereign, the Defendants argue that the § 1983 claims should be dismissed.[73]

However, the asserted interest in *Becker* is different than what is being pled here. In *Becker*, the Tribe invoked its Fourteenth Amendment Due Process rights to enjoin a state court action against it.[74] The Tribe in *Becker* argued that the state lacked jurisdiction over it because the Tribe had a sovereign right to choose the forum of its choice to resolve its property rights dispute.[75] The Tenth Circuit reasoned that while the law "limits state-court jurisdiction over certain Indian matters," the interest being protected is *tribal sovereignty*.[76] Thus, in seeking to

---

[70] *Muscogee*, 611 F.3d at 1234. The parties have not identified any Tenth Circuit decisions where a tribe was permitted to bring § 1983 claims as a "person." However, other courts have done so. For example, in *Texas v. Ysleta del Sur Pueblo*, 367 F. Supp. 3d 596 (W.D. Tex. 2019), a court found that a tribe could bring certain claims against the state of Texas under § 1983 because the claims could have been brought as an individual and because they asserted interests that a similarly situated private party enjoyed. *Id.* at 607. The tribe's claims involved an alleged discriminatory statutory scheme. *Id.*
[71] Compl. ¶ 136.
[72] *Id.* (citing *Becker*, 868 F.3d at 1205).
[73] *Id.* at 7.
[74] *Becker*, 868 F.3d at 1201–1202, 1205–1206.
[75] *Id.*
[76] *Id.* at 1206.

protect its tribal sovereignty, the Tenth Circuit held that the Tribe proceeded in its sovereign capacity.[77] Here, the Complaint asserts that the Tribe was deprived of due process and equal protection as a participant in the bidding process. Unlike the interest in *Becker*, there is nothing uniquely sovereign about the Tribe's interest as a bidder seeking to protect its rights against alleged unlawful discrimination or deprivation of due process of law. The Tribe has standing to sue under § 1983.[78]

### B.    Eleventh Amendment Immunity and 42 U.S.C. § 1983

Defendants next argue that they are protected by Eleventh Amendment sovereign immunity.[79] "The Supreme Court has interpreted the Eleventh Amendment to mean 'States may not be sued in federal court unless they consent to it in unequivocal terms or unless Congress, pursuant to a valid exercise of power, unequivocally expresses its intent to abrogate the immunity.'"[80] "Eleventh Amendment immunity's primary purpose is to accord states the respect owed to them as joint sovereigns."[81] Thus, unless an exception applies, states may not be brought into federal court without their consent. But because states may consent to jurisdiction or waive their immunity, "[t]he Eleventh Amendment does not automatically destroy a federal court's jurisdiction to decide lawsuits against a state."[82] "Rather, the Eleventh Amendment grants states a legal power to assert sovereign immunity as a defense."[83]

---

[77] *Id.*

[78] Because the Tribe has standing to sue under § 1983, the court declines to address the Tribe's *parens patriae* standing arguments.

[79] Ure MTD 6; SITLA/McConkie MTD 7–9; Cox/Styler MTD 16–17, 20–21.

[80] *Muscogee (Creek) Nation v. Okla. Tax Comm'n*, 611 F.3d 1222, 1227 (10th Cir. 2010) (quoting *Green v. Mansour*, 474 U.S. 64, 68 (1985)).

[81] *Steadfast Ins. Co. v. Agric. Ins. Co.*, 507 F.3d 1250, 1252 (10th Cir. 2007).

[82] *Id.*

[83] *Id.*

A suit against a state "or one of its agencies or departments . . . is proscribed by the Eleventh Amendment."[84] Indian tribes are also subject to the Eleventh Amendment, and any claims they bring against states are barred unless "they fall within the [*Ex parte Young*] exception . . . for certain suits seeking declaratory and injunctive relief against state officers . . . ."[85] The *Ex parte Young* exception rests on the "well recognized irony that an official's unconstitutional conduct constitutes state action under the Fourteenth Amendment but not the Eleventh Amendment."[86] Indeed, "a suit for *prospective* relief against state officials named in their official capacities based upon an ongoing violation of federal law is not considered an action against a state within the meaning of the Eleventh Amendment because, under such circumstances, the officials are stripped of their representative character."[87] And when state officials are sued in their official capacity for retroactive relief (such as damages), they are not "person[s]" who can be sued under § 1983 because the suit is treated as a claim against the state.[88] Conversely, damages are available in a suit against state officials in their individual capacities under § 1983 because they "come to court as individuals."[89]

"In determining whether the doctrine of *Young* avoids an Eleventh Amendment bar [to a suit against a state or its officers], a court need only conduct a 'straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'"[90] However, *Ex parte Young* does not extend to suits where the

---

[84] *Papasan v. Allain*, 478 U.S. 265, 277 (1986).
[85] *Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261, 269 (1997) (citing *Ex parte Young*, 209 U.S. 123 (1908)).
[86] *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 105 (1984).
[87] *Muscogee*, 611 F.3d at 1234 (emphasis added).
[88] *Hafer v. Melo*, 502 U.S. 362 (1991) (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)).
[89] *Id.*
[90] *Muscogee*, 611 F.3d at 1232 (quoting *Verizon Md. Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002)).

federal law violation is no longer "ongoing"[91] and in certain cases where "special sovereignty interests" are implicated.[92]

Defendants argue that the Complaint should be dismissed because it does not specify which Defendants are being sued in which capacity.[93] The Tenth Circuit has held that if "'the complaint fails to specify the capacity in which the government official is sued, we look to the substance of the pleadings and the course of the proceedings in order to determine whether the suit is for individual or official capacity.'"[94] The relief sought is a helpful indicator in determining whether the defendants are named in their individual or official capacities.[95] Because the Complaint seeks damages from all Defendants,[96] the court finds that the state officials were sued in their individual capacities. Next, because the Complaint only seeks declaratory relief from SITLA, the court finds that SITLA and its Director are sued in their official capacities. Because the Complaint alleges that Governor Cox has authority over SITLA[97] and because the Tribe's briefing alleges that the Governor has a duty to intervene in SITLA's alleged constitutional violations,[98] the court also considers whether Governor Cox can be sued in his official capacity.

1. **SITLA**

---

[91] *Green*, 474 U.S. at 71.

[92] *Coeur d'Alene Tribe*, 521 U.S. at 281.

[93] Ure MTD 6–7, SITLA/McConkie MTD 6, Cox/Styler MTD 15–21.

[94] *Trackwell v. United States Gov't*, 472 F.3d 1242, 1244 (10th Cir. 2007) (quoting *Pride v. Does*, 997 F.2d 712, 715 (10th Cir. 1993). *But see Johnson v. Okla. Dep't of Transp.*, 645 F. App'x 765, 768 (10th Cir. 2016) (citing Sixth Circuit and Seventh Circuit opinions which held that when complaints do not specify that a defendant is sued in her individual capacity, courts assume that the defendant has been sued in her official capacity only).

[95] *See Pride v. Does*, 997 F.2d 712, 715 (10th Cir. 1993) (reasoning that a request for punitive damages points to an individual capacity claim); *Houston v. Reich*, 932 F.2d 883, 885–86 (10th Cir. 1991) (reasoning that course of proceedings implied intent to bring claims against defendants in both their official and individual capacities even though the complaint only sought damages).

[96] Compl. 27.

[97] Compl. ¶ 15.

[98] Resp. in Opp. to Governor Cox and Former Director Styler's Motion to Dismiss 2–4, ECF No. 39, filed October 16, 2023.

SITLA contends that it cannot be sued because it is a Utah agency and claims against the state's agencies are effectively claims against the state.[99] Sovereign immunity usually is available to state agencies "regardless of the relief sought."[100] "In terms of scope, Eleventh Amendment immunity extends to states and state entities but not to counties, municipalities, . . . [or other political subdivisions]."[101] "To determine the category into which the entity falls, we consider whether that entity is . . . an 'arm of the state.'"[102] "If a state entity is more like a political subdivision—such as a county or city—than it is like an instrumentality of the state, that entity is not entitled to Eleventh Amendment immunity."[103]

"Although ultimately a matter of federal law, arm-of-the-state status must be determined in each case by reference to the particular state laws characterizing the entity."[104] To determine whether an entity is an arm of the state, the Tenth Circuit "employ[s] a two-step process."[105] "[T]he court first examines the degree of autonomy given to the agency, as determined by the characterization of the agency by state law and the extent of guidance and control exercised by the state."[106] This first step is evaluated under four "primary factors" articulated in *Steadfast Ins. Co. v. Agricultural Ins. Co.*:

> *First*, we assess the character ascribed to the entity under state law. Simply stated, we conduct a formalistic survey of state law to ascertain whether the entity is identified as an agency of the state. *Second*, we consider the autonomy accorded the entity under state law. This determination hinges upon the degree of control the state exercises over the entity. *Third*, we study the entity's finances. Here, we look to the amount of state funding the entity receives and consider whether the entity has the ability to issue bonds or levy taxes on its own behalf. *Fourth*, we ask whether the entity in question is concerned primarily with local or state affairs. In

---

[99] SITLA/McConkie MTD 5–6.
[100] *Metcalf & Eddy*, 506 U.S. at 146.
[101] *Steadfast*, 507 F.3d at 1253 (citing *Mt. Healthy City Sch. Dist. v. Doyle*, 429 U.S. 274, 280 (1977)).
[102] *Id.*
[103] *Id.* (citing *Mt. Healthy*, 429 U.S. at 280).
[104] *Sturdevant v. Paulsen*, 218 F.3d 1160, 1164 (10th Cir. 2000).
[105] *Henessey v. Univ. of Kan. Hosp. Auth.*, 53 F.4th 516, 518 (10th Cir. 2023) (citing *Duke v. Grady Mun. Schs.*, 127 F.3d 972, 975 (10th Cir. 1997)).
[106] *Haldeman v. Wyo. Farm Loan Bd.*, 32 F.3d 469, 473 (10th Cir. 1994).

answering this question, we examine the agency's function, composition, and purpose.[107]

"If these factors are in conflict and point in different directions, a court should proceed to the second step and consider the 'twin reasons' underlying the Eleventh Amendment—avoiding an afront to the dignity of the state and the impact of a judgment on the state treasury."[108]

The Tenth Circuit has held that the burden falls on the entity that is asserting that it is an arm of the state.[109] Thus, Defendants bear the burden of demonstrating that SITLA is an arm of the state. Defendants initially contended that because SITLA's enabling statute states that it is "within the state government," it is an arm of the state and has immunity.[110] The Tribe responded in its opposition that SITLA "is an independent entity and its assets are segregated from the State and held in trust," and therefore SITLA is not an "arm of the state."[111] In their reply, Defendants point to SITLA's enabling statute in making the argument that SITLA is not sufficiently autonomous from state government to be considered an arm of the state.[112] Because Defendants bear the burden of proving that SITLA is an arm of the state, the court turns to each of the Defendants' arguments as applied to the *Steadfast* factors. In doing so, the court may also sua sponte identify "judicially noticeable evidence [if doing so] clearly resolves the inquiry."[113]

---

[107] *Steadfast Ins. Co. v. Agric. Ins. Co.*, 507 F.3d 1250, 1253 (10th Cir. 2007).

[108] *Hennessey*, 53 F.4th 516, 528 (citing *Duke*, 127 F.3d at 978).

[109] *Id.* at 531.

[110] SITLA/McConkie MTD 5 (citing Utah Code Ann. § 53C-1-201(1)(a)).

[111] Resp. in Opp. to SITLA/McConkie MTD 3.

[112] *Id.* While these arguments were raised for the first time in the reply brief and would normally be disregarded, courts "make an exception when the new issue argued in the reply brief is offered in response to an argument raised in the plaintiff's brief." *In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1119 (10th Cir. 2015); *see Perez v. City of Denver*, 2023 WL 7486461 at *2 n.3 (10th Cir. Nov. 13, 2023) ("[W]e see no reason why the arguments raised by a party for the first time in a reply brief in the district court should be evaluated any differently [than in an appellate court].").

[113] *Hennessey v. Univ. of Kan. Hosp. Auth.*, 53 F.4th 516, 533 (10th Cir. 2023).

a.      **Character of SITLA Under State Law**

Turning to the particular state laws that characterize SITLA, Defendants cite to SITLA's enabling statute, which describes it as an "independent state agency and not a division of any other department"[114] that is "established within state government."[115] In Utah's Independent Entities Act, "independent state agency" is defined as "an entity that is created by the state, but is independent of the governor's direct supervisory control."[116] The Act states that in addition to being an independent state agency, SITLA is also an independent entity,[117] which is "an entity having a *public purpose relating to the state or its citizens* that is individually created by the state or is given by the state the right to exist and conduct its affairs as an independent state agency or independent corporation."[118] Taken together, these statutes suggest that SITLA is relatively autonomous compared to other agencies, but it is an agency dealing with a "public purpose relating to the state" nonetheless.

The same statute contains additional language further supporting this finding. It makes clear that an "'independent entity' does not include: an institution within the state system of higher education, a city, county, or town, a local school district," etc.[119] Thus, while "independent state agencies" are independent from the governor's direct supervisory control, the state does not classify them in the same category as cities, counties, towns, or other entities commonly described as "political subdivisions."[120] In short, the state's characterization of

---

[114] Utah Code Ann. § 53C-1-201(2) (Westlaw through 2023 2nd Spec. Legis. Sess.).
[115] § 53C-1-201(1)(a).
[116] § 63E-1-102(5).
[117] § 63E-1-102(4)(b)(vi).
[118] § 63E-1-102(4)(a) (Westlaw through 2023 2nd Spec. Session).
[119] § 63E-1-102(c).
[120] The overall question in the determination, after all, is whether the "state entity is more like a political subdivision—such as a county or city—than it is like an instrumentality of the state." *Steadfast*, 507 F.3d at 1253.

SITLA favors a finding that it is an instrumentality of the state as opposed to an independent subdivision of the state.

      **b.**   **Autonomy**

"The autonomy factor is the most complex of the four because it spans a broad range of considerations. In analyzing this factor, a court must remain cognizant that some ties and oversight will always remain between the state and an entity created by the state."[121] The Tenth Circuit has identified a non-exhaustive list of considerations in analyzing the autonomy factor: the legislative or executive controls over the entity, the entity's ownership and control of property, the ability to form contracts, the ability to set policies without oversight, and the ability to bring suit on its own behalf.[122]

In evaluating the degree of control the State has over the entity, Defendants argue that SITLA's enabling statute states that it is "subject to the usual legislative and executive department controls," with a few variances.[123] They note that SITLA's board is appointed "by the governor with the advice and consent of the Senate" and that the board selects SITLA's director "with the consent of the governor."[124] This characterization, however, oversimplifies SITLA's structure. SITLA is governed by a seven-member board of trustees, six of which are appointed for six-year terms "on a nonpartisan basis by the governor with the advice and consent of the Senate."[125] The governor must choose the nonpartisan appointments from a predetermined

---

[121] *Hennessey*, 53 F.4th at 536 (citing *Takle v. Univ. of Wis. Hosp. & Clinics Auth.*, 402 F.3d 768, 771 (7th Cir. 2005)).

[122] *Id.* at 536–542.

[123] Utah Code Ann. § 53C-1-201(3)(a) (Westlaw through 2023 2nd Spec. Legis. Sess.). For example, unlike other entities, the director of SITLA is allowed "to classify a business proposal submitted to the administration as protected under [Utah law] for as long as necessary to evaluate the proposal." § 53C-1-201(3)(b). SITLA also has a process allowing for expedited approval of rules. § 53C-1-201(3)(c).

[124] § 53C-1-202(3)(a).

[125] § 53C-1-202(3)(a).

list of candidates provided by an independent nominating committee.[126] The seventh member of the board serves at the pleasure of the governor and may be appointed without regard to the nominating committee's recommendation.[127] The board, with the consent of the governor, selects the director of SITLA and has authority to remove the director "for cause by a majority vote of the board."[128] If the governor withholds consent, "he shall give his reasons in writing to the board."[129] In short, the appointment procedure creates considerable independence from the governor's control, but it is not completely independent. The governor may only directly appoint one of the seven board members, and the rest must be selected from a predetermined list of candidates. After Senate confirmation, the board then selects the director, but the governor could withhold consent.

However, the power of appointment is "but one consideration and . . . is not sufficient to establish that the autonomy factor favors an arm-of-the-state finding."[130] Indeed, "the power to appoint is not the power to control."[131] In addition to the appointment power, "[c]ourts also look at (1) the ability of the governor to remove appointees, and (2) the governor's power to block or veto action taken by the board of the entity."[132] Turning to removal, the "governor or five board members may, for cause, remove a member of the board."[133] The governor's ability to remove the director is more indirect: the governor "may petition the board for removal of the director for cause," which will require the board "to hold a hearing within sixty days of receipt."[134] The

---

[126] *See* § 53C-1-203.
[127] § 53C-1-202(5)(a).
[128] § 53C-1-301(1)(b), (5)(a).
[129] Utah Code Ann. § 53C-1-301(1)(b) (Westlaw through 2023 2nd Spec. Legis. Sess.).
[130] *Hennessey*, 53 F.4th at 537 (citing *Fresenius Med. Care Cardiovascular Res., Inc. v. P.R. and the Caribbean Cardiovascular Ctr. Corp.*, 322 F.3d 56, 71 (1st Cir. 2003)).
[131] *Id.* (citing *Takle*, 402 F.3d at 770).
[132] *Id.* (citing *Steadfast Ins. Co.*, 507 F.3d at 1254; *Hess*, 513 U.S. at 44).
[133] Utah Code Ann. § 53C-1-202(10) (Westlaw through 2023 2nd Spec. Legis. Sess.).
[134] § 53C-1-301(5)(b)(ii).

board must remove the director if its "finds by a preponderance of the evidence cause for removal."[135] Thus, the governor can remove the board members, but cannot remove the director.

While this diminishes the ability of the governor to direct the day-to-day operations of SITLA, other structural controls imposed by the state help resolve the issue. The agency's annual budget must be approved by the board and by the governor.[136] On behalf of SITLA, the director has authority to form contracts regarding trust land and establish related fees, procedures, and rules only if consistent with policies created by the board and the fiduciary responsibilities to the beneficiaries.[137] The director's actions can be overturned by the board[138] and SITLA's actions are subject to judicial review.[139] SITLA is also subject to an independent oversight committee, called the Utah Land Trusts Protection and Advocacy Office, which reviews SITLA activities and can recommend an audit.[140] And SITLA has quarterly reporting obligations to "beneficiaries, [the] governor, [the] legislature, and the public."[141] In short, while SITLA's director is insulated from direct control, board members may be removed for cause by the governor and the state has imposed significant structural restraints on the entity.

In addressing the other autonomy factors, "the director may be sued or be sued as the director of [SITLA]"[142] but the "attorney general shall represent the board, director, or administration in any legal action relating to trust lands and . . . undertake suits for the collection

---

[135] § 53C-1-301(5)(b)(iii).
[136] The director also creates a budget, which must be approved by the board and governor. § 53C-1-303(1)(e).
[137] § 53C-1-302(1)(a), 53C-1-303(3)(d). These responsibilities are outlined in the Utah Constitution, SITLA's enabling act, and in internal policies set by the board. *Id.*
[138] The director's decisions are upheld unless the board determines "by a preponderance of the evidence that the decision violated applicable law, policy, or rules." Utah Code Ann. § 53C-1-304 (Westlaw through 2023 2nd Spec. Legis. Sess.).
[139] Final actions by the director to lease, sell, or exchange specific real property or other trust assets are not subject to administrative review, only judicial review. § 53C-1-304(2)(b), (5).
[140] § 53D-2-203.
[141] § 53C-1-303(1)(m).
[142] § 53C-1-303.

of royalties, rental, and other damages in the name of the state."[143] While the ability to sue or be sued on an entity's own behalf supports a finding of autonomy, the fact that certain types of legal action (including cases implicating state liability) are represented by the attorney general cuts against that conclusion. Next, regarding the ability to own and control property, SITLA is the trustee over state trust lands on behalf of the state.[144] SITLA does not own title to the land but it may "acquire and dispose of [state] lands and assets in accordance with law."[145] And while the director can enter into contracts to improve trust lands, doing so must comply with the restraints explained above.[146] These restrictions on SITLA demonstrate that it lacks the ability to "deal freely with the property under its control."[147]

In sum, in reviewing the statutes as applied to the various considerations identified by the Tenth Circuit, SITLA is not sufficiently autonomous from the state. While the agency has some independence regarding the appointment of the board and director, the governor may remove any board member for cause. Moreover, the state imposes a web of oversight and control over SITLA's actions. This favors a finding that it is more like an instrumentality of the state rather than an independent political subdivision.

---

[143] § 53C-1-303(1)(a). SITLA may hire in-house counsel to perform legal duties with the consent of the attorney general. § 53C-1-303(3).
[144] *See* Utah Code Ann. § 53C-1-303 (Westlaw through 2023 2nd Spec. Legis. Sess.); *Nat'l Parks & Conservation Ass'n v. Bd. of State Lands*, 869 P.2d 909, 917 (Utah 1993), *partially superseded by statute,* School and Institutional Trust Lands Management Act, 1994 Utah Laws 1304 (reviewing the history of state trust land and finding that the state legislature delegated its authority to the Board of State Lands, which was replaced by SITLA in 1994).
[145] § 53C-1-303(1)(a)(ii).
[146] § 53C-1-303(1)(a)(ii).
[147] *Steadfast Ins. Co.*, 507 F.3d at 1254.

### c.    Finances

Regarding finances, courts look to "the amount of state funding the entity receives and consider whether the entity has the ability to issue bonds or levy taxes on its own behalf."[148] "If an entity cannot levy taxes and its ability to issue bonds is subject to state review or state procedures, this is . . . likely an indicator that the entity is an arm of the state."[149]

First, turning to the funds SITLA receives, the director is required to submit "an annual management budget and financial plan for operations of the administration."[150] Once approved, "the director may expend money from the Land Grant Management Fund in accordance with the approved budget for the support of the director and administration activities."[151] It is not clear whether the money SITLA receives ever flows through the state treasury. But the distinction is immaterial—even if the money allocated for its budget never flows through the state treasury, Utah's Supreme Court has held that the state bears "the general liability of a trustee to reimburse the trust" if assets are mismanaged.[152] Thus, for the purposes of analyzing whether SITLA is an arm of the state, the funds it receives are state funds.[153]

Second, SITLA has no statutory authority to issue bonds or levy taxes. Because SITLA is funded by the state and cannot levy taxes or issue bonds, this factor favors a finding that it is an arm of the state.

---

[148] *Hennessey*, 53 F.4th at 532 (citing *Steadfast Ins. Co.*, 507 F.3d at 1253).
[149] *Id.*
[150] Utah Code Ann. § 53C-1-303(1)(e) (Westlaw through 2023 2nd Spec. Legis. Sess.).
[151] § 53C-3-101(2)(a).
[152] *State ex rel. Sch. & Institutional Trust Land Admin. v. Mathis*, 223 P.3d 1119, 1122 (Utah 2009).
[153] *Steadfast Ins. Co*, 507 F.3d at 1255.

#### d.    State or Local Concern

In determining whether an entity is concerned primarily with state or local affairs, courts "examine the agency's function, composition, and purpose."[154] Having already addressed the agency's function and composition, the court examines SITLA's purpose. As background, the conditions of Utah's entry into the Union were codified in the Utah Enabling Act.[155] Among other things, the Act provided that certain lands "would be 'granted to [the state] for the support of the common schools,'[156] and '[t]hat the proceeds of lands . . . granted for educational purposes . . . [would] constitute a permanent school fund.'"[157] These requirements were incorporated into section 2 of article XX of Utah's constitution.[158] The state legislature expressly delegated its duties under Utah's Enabling Act and Utah's constitution to SITLA.[159] Given that SITLA is entrusted with a constitutionally-imposed state duty, SITLA's purpose is clearly a state concern.

#### e.    Summary

Having determined that each of the *Steadfast* factors favors a finding that SITLA is an arm of the state, it is entitled to claim Eleventh Amendment immunity from suit in federal court.

### 2.    Governor Cox

Defendants Governor Spencer Cox, Director Michael Styler, Director Michelle McConkie, and Director David Ure ("State Official Defendants") argue that they are not proper parties under *Ex parte Young* and have Eleventh Amendment immunity.[160] However, as

---

[154] *Steadfast Ins. Co.*, 507 F.3d at 1253.
[155] *Mathis*, 223 P.3d at 1222 (citing the Utah Enabling Act, ch. 138, 28 Stat. 107 (1894)).
[156] *Id.* (citing Utah Enabling Act § 6).
[157] *Id.* (citing Utah Enabling Act § 10).
[158] *Id.*
[159] Utah Code Ann. § 53C-1-102(1) (Westlaw through 2023 2nd Spec. Legis. Sess.).
[160] Ure MTD 6; SITLA/McConkie MTD 7–9; Cox/Styler MTD 16–17, 20–21.

explained earlier, the Complaint only asserts official capacity claims against Governor Cox and Director McConkie.

The Tribe cannot bring its § 1983 claims for damages against the named officials in their official capacity because doing so is barred by the Eleventh Amendment.[161] The Tribe, however, "may sue individual state officers acting in their official capacities if the complaint alleges an ongoing violation of federal law and the plaintiff only seeks prospective relief."[162] Claims may only be brought against those officers that, "by virtue of [their] office, [have] some connection with the enforcement of the act."[163] "Some connection" does not mean that the officials must "have a 'special connection' to the unconstitutional act or conduct."[164] But state officials must "have a particular duty to 'enforce' the statute in question and a demonstrated willingness to exercise that duty."[165] A general duty to enforce the law is typically insufficient.

Defendant Governor Cox argues that the Complaint only provides "collective allegations" that group him with other defendants by virtue of being the head of the state's executive branch.[166] Governor Cox contends that he cannot be held liable for the actions of subordinate officers.[167] And to the extent that the Complaint alleges that he actively participated in a conspiracy to deprive the Tribe of their constitutional rights, the Complaint fails to provide more than "collective allegations."[168] He argues that such collective allegations are insufficient

---

[161] *Pride v. Does*, 997 F.2d 712, 715 (10th Cir. 1993) (citing *Hafer v. Melo*, 502 U.S. 21, 30 (1991)).
[162] *Hendrickson v. AFSCME*, 992 F.3d 950, 965 (10th Cir. 2021) (citing *Ex parte Young*, 209 U.S. 123, 159–60 (1908)).
[163] *Ex parte Young*, 209 U.S. at 441.
[164] *Hendrickson*, 992 F.3d at 965 (quoting *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 828 (10th Cir. 2007)).
[165] *Id.* (quoting *Ex parte Young*, 209 U.S. at 157).
[166] Cox/Styler MTD 14 (quoting *Brown v. Montoya*, 662 F.3d 1152, 1165 (10th Cir. 2011)).
[167] *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).
[168] *Id.* (quoting *Montoya*, 662 F.3d at 1165)).

to state a claim because they fail to isolate the allegedly unconstitutional acts of the government defendants.[169]

Federal courts unanimously agree that "§ 1983 does not allow a plaintiff to hold an individual government official liable 'under a theory of respondeat superior.'"[170] The Supreme Court has rejected the idea that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution."[171] Instead, "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct."[172] Thus, when reviewing a 12(b)(6) motion to dismiss, "a plaintiff must plead that each government-official defendant, through the official's *own* actions, has violated the Constitution."[173] In short, Governor Cox cannot be held vicariously liable for the actions of the other defendants.

Turning to Governor Cox's direct involvement, because official capacity suits require an allegation of an ongoing violation of federal law, courts require that the named state official "have some connection with the enforcement" of the challenged action.[174] The Complaint alleges that he "is responsible for . . . overseeing the operation of the State's executive branch [and] . . . ensuring that the State of Utah complies with federal laws."[175] This averment alone is not nearly enough to establish "some connection" between the Governor and SITLA. The Complaint does not explain how a duty to oversee the executive branch connects to SITLA's actions in this case when SITLA was purposefully designed to limit the Governor's control over day-to-day affairs. If anything, the duty to oversee SITLA is specifically granted to the Utah Land Trusts Protection

---

[169] *Id.*
[170] *Dodds v. Richardson*, 614 F.3d 1185, 1194 (quoting *Gagan v. Norton*, 35 F.3d 1473, 1476 n.4 (10th Cir. 1994)).
[171] *Iqbal*, 556 U.S. at 677.
[172] *Id.*
[173] *Id.* at 676.
[174] *Ex parte Young*, 209 U.S. at 157.
[175] Compl. ¶ 15.

24

and Advocacy Office, a separate independent entity.[176] Moreover, it is not clear how Governor Cox could be enjoined in a way that could remedy the alleged breach. The Complaint fails to assert a claim against Governor Cox that complies with the *Ex parte Young* exception.

### C.   Statute of Limitations

Defendants next contend that because Utah has a four-year statute of limitations period for § 1981–85 claims, the claims should be dismissed. They argue that a letter dated February 26, 2019, shows that the Tribe knew of the injury underlying its federal claims at least as of that date, but the Tribe impermissibly filed the Complaint more than four years later.

The Tribe concedes that Utah has a four-year statute of limitations, but argues that the accrual period began on August 30, 2022, the date the whistleblower complaint was filed.[177] The Tribe asserts that the bidding process was designed to appear innocuous in order to conceal the Defendants' unlawful actions. Thus, the Tribe contends that it did not know and could not have known that SITLA's decision to suspend the bidding process gave rise to an actionable claim.[178]

Sections 1981–85 do not contain a limitations period. Instead, "Congress has directed the courts to look to state law in civil rights cases where federal law is 'deficient in the provisions necessary to furnish suitable remedies . . . [and the state law] is not inconsistent with the Constitution and laws of the United States . . . .'"[179] Under this direction, federal courts generally apply the period of limitations of the forum state applicable to the most nearly analogous state action.[180] However, the Supreme Court has made clear that the statute of limitations period for constitutional violations under § 1983 is "dictated by the personal injury statute of limitations in

---

[176] Utah Code Ann. § 53D-2-203 (Westlaw through 2019 First Spec. Legis. Sess.).
[177] Resp. in Opp. to SITLA/McConkie MTD 9–13.
[178] Compl. ¶¶ 82–95; Resp. in Opp. to SITLA/McConkie MTD 11.
[179] *Baker v. Bd. of Regents*, 991 F.2d 628, 630 (10th Cir. 1993) (quoting 42 U.S.C. § 1988).
[180] *See id.*

25

the state in which the claim arose."[181] "In states having multiple personal injury statutes of limitations, 'courts considering § 1983 claims should borrow the general or residual statute for personal injury actions.'"[182] Utah's residual statute is found in § 78B-2-307(4), which provides a four-year statute of limitations.[183]

The Court "has also characterized § 1981 claims as actions for injury to personal rights."[184] The Tenth Circuit has held that the same considerations regarding the proper limitations period apply to § 1982.[185] Similarly, "[f]or conspiracy claims under § 1985, courts have [] applied the forum state's personal-injury statute of limitations."[186] Thus, the appropriate state statute of limitations for §§ 1981, 1982, and 1985 should also be dictated by Utah's residual personal injury statute of limitations.[187] The Tribe's federal claims are subject to Utah's four-year statute of limitations.[188]

While Utah law governs the limitations period, "the accrual date . . . is a question of federal law."[189] Under federal law, "'a civil rights action accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action,' . . . or 'when the plaintiff's right to resort to federal court was perfected.'"[190] "An accrual analysis begins with identifying 'the

---

[181] *McCarty v. Gilchrist*, 646 F.3d 1281, 1289 (10th Cir. 2011) (citing *Wallace v. Kato*, 549 U.S. 384, 387 (2007)).

[182] *Arnold v. Duchesne Cty.*, 26 F.3d 982, 985 (quoting *Owens v. Okure*, 488 U.S. 235, 249–50 (1989)).

[183] Utah Code. Ann. § 78B-2-307(4) (Westlaw through 2023 2nd Spec. Legis. Sess.); *Fratus v. Deland*, 49 F.3d 673, 675 (10th Cir. 1995) (holding that Utah's residual statute of limitations governs suits under § 1983.).

[184] *Baker*, 991 F.2d at 630 (citing *EEOC v. Gaddis*, 733 F.2d 1373 (10th Cir. 1984)).

[185] *Scheerer v. Rose State Coll.*, 950 F.2d 661, 664–65 (10th Cir. 1991).

[186] *Lyons v. Kyner*, 367 Fed. Appx. 878, 881 (10th Cir. 2010) (citing *Rozar v. Mullis*, 85 F.3d 556, 561 (11th Cir. 1996)).

[187] *Baker*, 991 F.2d at 630; *see also Sasser v. Salt Lake City Corp.*, No. 15-cv-606, 2017 WL 5991732, at *3 (D. Utah Dec. 1, 2017). 28 U.S.C. § 1658 provides a four-year statute of limitations for any "civil actions arising under an Act of Congress." Because the Complaint asserts claims under 42 U.S.C. § 1981, the statute of limitations period could be defined by § 1658. *Jones v. R.R. Donnelley & Sons*, 541 U.S. 369 (2004). However, because the limitations period would be four years under either § 1658 or Utah law, the result is the same.

[188] *Fratus v. Deland*, 49 F.3d 673, 675 (10th Cir. 1995). § 1981 has the same four-year limitations period. *Sasser v. Salt Lake City Corp.*, No. 15-cv-606, 2017 WL 5991732, at *3 (D. Utah Dec. 1, 2017). Sections 1982 and 1985 are also subject to the same period.

[189] *Wallace v. Kato*, 549 U.S. 384, 388 (2007).

[190] *Herrera v. City of Espanola*, 32 F.4th 980, 990 (10th Cir. 2022) (quoting *Smith v. City of Enid*, 149 F.3d 1151, 1154 (10th Cir. 1998) and *Bergman v. United States*, 751 F.2d 314, 316 (10th Cir. 1984), respectively).

specific constitutional right' alleged to have been infringed."[191] "The focus should not be on the remedy, but on the elements of the cause of action, because they most fully describe the essence of the claim."[192] "[A] civil rights action accrues when facts that would support a cause of action are or should be apparent."[193] But "a plaintiff need not have conclusive evidence of the cause of injury in order to trigger the statute of limitations."[194] Nor does a plaintiff need to "know the full extent of his injuries before the statute of limitations begins to run."[195] A court instead "focus[es] on whether the plaintiff knew of facts that would put a reasonable person on notice that the wrongful conduct caused the harm."[196]

The analysis begins by identifying the specific elements required for a constitutional conspiracy claim. As stated previously, a constitutional conspiracy claim requires "'specific facts showing an agreement and concerted action among defendants,'— an 'agreement upon a common, unconstitutional goal,' and 'concerted action' taken 'to advance that goal.'"[197] The Complaint alleges a conspiracy to deprive Equal Protection and Due Process rights through unlawful discrimination. This claim requires an allegation that Defendants took "a particular course of action at least in part 'because of,' not merely 'in spite of' 'the law's differential treatment of a particular class of persons.'"[198] Thus, the Tribe's accrual period began when it had notice that Defendants conspired to discriminate against the Tribe because of its protected status.

[191] *McDonough v. Smith*, 588 U.S. __, 139 S.Ct. 2149, 2155 (2019) (quoting *Albright v .Oliver*, 510 U.S. 266, 271 (1994) (plurality opinion)).

[192] *Baker v. Bd. of Regents*, 991 F.2d 628, 631 (10th Cir. 1993).

[193] *Alexander v. Oklahoma*, 382 F.3d 1206, 1215 (10th Cir. 2004).

[194] *Id.*

[195] *Indus. Constr. Corp. v. United States Bureau of Reclamation*, 15 F.3d 963, 969 (10th Cir. 1994).

[196] *Id.* at 1216.

[197] *Bledsoe v. Carreno*, 53 F.4th 589, 609 (10th Cir. 2022) (quoting *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 533 (10th Cir. 1998); *Janny v. Gamez*, 8 F.4th 883, 919 (10th Cir. 2021)).

[198] *Vigil*, 666 F.3d at 685 (quoting *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)).

Defendants seek to include evidence outside of the pleadings.[199] Normally, "[a] 12(b)(6) motion must be converted to a motion for summary judgment if 'matters outside the pleading are presented to and not excluded by the court' and 'all parties . . . [are] given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.'"[200] However, "if a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss."[201] "When a complaint refers to a document and the document is central to the plaintiff's claim, the plaintiff is obviously on notice of the document's contents, and this rationale for conversion to summary judgment dissipates."[202]

Paragraph 104 of the Complaint refers to a letter sent by the Tribe's Chairman, Luke Duncan, to SITLA. The Tribe did not attach the letter to its Complaint. Defendants SITLA and Director McConkie purported to attach the letter in their motion to dismiss but failed to do so, supplying it later.[203] The letter may be considered because the Complaint references the contents of the letter, noting that the Tribe notified Director Ure about its concerns with SITLA's decision to suspend the sale. The letter appears central to the claims at issue, and there is no dispute as to its authenticity.

The court turns to the allegations in the Complaint and Chairman Duncan's letter in reviewing when the Tribe knew of (or should have known) facts sufficient to bring its claims. On February 21, 2019 Director Ure sent a letter to the Tribe stating that DNR countered the Tribe's

---

[199] Ure MTD 11.
[200] *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1385 (10th Cir. 1997) (quoting Fed. R. Civ. P. 12(b)).
[201] *Id.*
[202] *Id.*
[203] SITLA/McConkie MTD 11.

bid with a higher bid.[204] The following day, Director Ure sent a letter informing the Tribe that SITLA voted to suspend proceedings on the proposed sale in order to address issues with the appraisal and expedited advertising period.[205] Chairman Duncan responded to Director Ure's February 22, 2019 letter on February 26, 2019.[206] Chairman Duncan wrote that "SITLA's conduct toward the Tribe in response to the Tribe's successful bid . . . reeks of prejudice towards the Ute Indian Tribe."[207] The letter also alleged that "Governor [Cox] . . . has gotten involved in this prejudicial conduct by claiming he wants to have a state public preserve created out of these Tabby Mountain lands. The Ute Tribe views the Governor[']s conduct as a smoke screen in an attempt to give SITLA cover for SITLA's outrageous conduct."[208] In the final paragraph, the letter states that the "Tribe is entitled to hold SITLA accountable for its conduct and for refusing to recognize the Tribe as the successful bidder in the bid auction sale . . . [and] will . . . seek all legal remedies available to them."[209]

The Complaint alleges that the Tribe's suspicion materialized into a cognizable claim when a whistleblower complaint was filed on August 30, 2022.[210] Chairman Duncan's letter states that SITLA told the Tribe that it suspended the sale to "allow more time to fully address beneficiaries' concerns."[211] Viewed in the light most favorable to the Plaintiff, the letter permits an inference that the Tribe could have reasonably believed that SITLA intended that the sale's

---

[204] Compl. ¶ 88.

[205] *Id*. ¶ 93.

[206] According to the Complaint, the letter only "demanded that SITLA honor the Tribe's right to purchase the property pursuant to [SITLA's procedure]." Compl. ¶ 104.

[207] Letter from Chairman Duncan to SITLA 2, ECF No. 51, filed April 24, 2024.

[208] *Id.*

[209] *Id.*

[210] Compl. ¶ 4. Moreover, the Tribe requires a final agency decision in order to challenge the action under state law or under 42 U.S.C. § 1981. Utah Code Ann. § 78A-3-102(3)(e)(iii); *See Herrera v. City of Espanola*, 32 F.4th 980, 1094 n.8 (10th Cir. 2019) ("[W]ithin the context of a claim arising under 42 U.S.C. § 1981, we suggested the continuing violation doctrine was available only where a plaintiff had to exhaust administrative remedies before filing suit.).

[211] Letter from Chairman Duncan to SITLA 2, ECF No. 51, filed April 24, 2024.

suspension would be temporary and SITLA's final decision would determine the Tribe's next steps.[212] Put differently, the Tribe's letter may be viewed as a reaction to SITLA informing it that the sale was suspended, not that the Tribe's bid had been irrevocably rejected and the Tribe would not be able to purchase the surface rights to Tabby Mountain. Also, the Complaint alleges that SITLA informed the Tribe that it would reach out to the Tribe "'when it determines to move forward with further action.'"[213] Taken together, the allegations of the Complaint and Chairman Duncan's letter do not sufficiently demonstrate that the Tribe knew or should have known it was injured in 2019. Defendants bear the burden on this issue but have not carried it.

### D. Rule 8 Pleading

Defendants argue that the Tribe's claims under federal law should be dismissed because they are not plausibly alleged.[214] As explained, the Rule 8 "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"[215] "Detailed factual allegations" are not needed to survive a Rule 12(b)(6) motion to dismiss.[216] But the pleadings must provide "sufficient factual content" to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[217] More must be done than "pleading facts that are 'merely consistent with' a defendant's liability."[218] Adequate pleadings "nudge . . . claims across the line from conceivable to plausible," which is required to survive a 12(b)(6) motion to dismiss.[219]

---

[212] Further, the Complaint alleges that SITLA's February 22, 2019 press release explicitly stated that SITLA voted to "temporarily suspend proceedings on a proposed sale." Compl. ¶ 93.
[213] Compl. ¶ 97.
[214] Ure MTD 7; SITLA/McConkie MTD 7; Cox/Styler MTD 13–20, 25.
[215] *Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 335 U.S. 41, 47 (1957)).
[216] *Iqbal*, 556 U.S. at 678.
[217] *Id.* (quoting *Twombly*, 550 U.S. at 556).
[218] *Id.* (quoting *Twombly*, 550 U.S. at 556).
[219] *Twombly*, 550 U.S. at 570.

Where, as here, a plaintiff asserts claims for an equal protection violation, the complaint must allege plausible facts supporting discriminatory intent.[220] Discriminatory intent requires more than mere acquiescence.[221] It requires an averment "that the decision maker selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of' 'the law's differential treatment of a particular class of persons.'"[222] "So a discriminatory effect against a group or class may flow from state action, it may even be a foreseen (or known) consequence of state action, but it does not run afoul of the Constitution unless it is an intended consequence of state action."[223]

### 1.   Title VI Claims

Defendants next argue that the Tribe's Title VI count fails to state a claim because SITLA is not a governmental entity that receives federal funding and because a Title VI claim cannot be brought against governmental officials.[224]

Title VI prohibits "discrimination under any program or activity receiving Federal financial assistance."[225] While Title VI does not explicitly provide any remedies, the Supreme Court has held that there is an implied right of action.[226] The Tenth Circuit has held that "[t]he two elements for establishing a cause of action pursuant to Title VI are (1) that there is racial or national origin discrimination and (2) the entity engaging in discrimination is receiving federal assistance."[227] Further, the Tenth Circuit has held that "Title VI forbids discrimination only by recipients of federal funding; therefore, individual employees of such entities are not liable under

---

[220] *SECSYS, LLC v. Vigil*, 666 F.3d 678, 685 (10th Cir. 2012) (citing *Washington v. Davis*, 426 U.S. 229, 240)) *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).
[221] *See id.* (emphasis added).
[222] *Vigil*, 666 F.3d at 685 (quoting *Person. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)).
[223] *Id.* (citing *Feeney*, 442 U.S. at 279).
[224] Cox/Styler MTD 23; SITLA/McConkie MTD 7.
[225] 42 U.S.C. 2000d.
[226] *Alexander v. Sandoval*, 532 U.S. 275, 279–80 (2001).
[227] *Baker v. Bd. of Regents*, 991 F.2d 628, 631 (10th Cir. 1993).

Title VI."[228] Thus, because public officials are not "public entities," the Tribe's Title VI claims against the individual defendants fail.

Regarding the Title VI claim against SITLA, Defendants point out that the Tribe did not allege that it received financial assistance within the meaning of Title VI.[229] The Complaint only alleges that SITLA hoped to obtain federal funds—"DNR's bid . . . was contingent upon DNR accessing and transferring millions of federal funds to SITLA."[230] DNR failed to obtain the funding. The complaint lacks any other allegations regarding SITLA's federal financial assistance. Therefore, the Tribe's Title VI claim against SITLA fails.

### 2.    Conspiracy Claims under Federal Law

Defendants assert that the Complaint fails to state a conspiracy claim to deprive the Tribe of its Due Process and Equal Protection Rights.[231] Because the Complaint states that the §§ 1981 and 1982 claims are brought "via 42 U.S.C. § 1983," only the adequacy of the conspiracy claims under §§ 1983 and 1985(3) are in question.[232]

Because claims for damages against public officials implicate questions of qualified immunity, it is 'particularly important' that 'the complaint make clear exactly who is alleged to have done what to whom, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state.'"[233] This charge to give fair notice is especially true when a plaintiff brings civil conspiracy claims. Under either

---

[228] *Webb v. Swensen*, 663 Fed. App'x 609, 613 (10th Cir. 2016) (not selected for publication) (citing *Shotz v. City of Plantation*, 344 F.3d 1161, 1171 (11th Cir. 2003) ("It is beyond question . . . that individuals are not liable under Title IV.")).
[229] SITLA/McConkie MTD 8.
[230] Compl. ¶ 87.
[231] Cox/Styler MTD 15–21; SITLA McConkie MTD 14; Ure MTD 7–10.
[232] ¶ 128; Resp. in Opp. to SITLA/McConkie MTD 7, ECF No. 40, filed October 16, 2023. It is not clear whether the Complaint attempts to assert conspiracy claims under §§ 1981 and 1982 collectively against all Defendants or whether it asserts interference of contract claims under § 1981 and interference of property rights under § 1982 against each Defendant..
[233] *Brown v. Montoya*, 662 F.3d 1152, 1163 (10th Cir. 2011) (quoting *Kan. Penn Gaming*, 656 F.3d at 1215).

§§ 1983 or 1985(3), a plausible conspiracy claim requires "'specific facts showing an agreement and concerted action among defendants,'— an 'agreement upon a common, unconstitutional goal,' and 'concerted action' taken 'to advance that goal.'"[234] "However, because '[d]irect evidence of an agreement to join a . . . conspiracy is rare, . . . a defendant's assent can be inferred from acts furthering the conspiracy's purpose.'"[235] While "[t]he participants in the conspiracy must share the general conspiratorial objective, . . . they need not know all of the details of the plan designed to achieve the objective or possess the same motives for desiring the intended conspiratorial result."[236]

### a.   Governor Cox

To survive the Motion to Dismiss, the Complaint must plead factual content describing how Governor Cox purposefully discriminated against the Tribe because of its "race, national origin, ethnicity, and religion."[237] It is unclear what Governor Cox's involvement allegedly is in the matter. He is only described once individually. The Complaint states that he "is responsible for . . . overseeing the operation of the State's executive branch [and] . . . ensuring that the State of Utah complies with federal laws."[238] This averment, even taken as true, has no bearing on whether the Governor intentionally discriminated against the Tribe. It only states that he has a general duty to ensure compliance with federal law—far short of pleading facts demonstrating intent to discriminate or an agreement to deprive the Tribe of constitutionally protected rights.

---

[234] *Bledsoe v. Carreno*, 53 F.4th 589, 609 (10th Cir. 2022) (quoting *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 533 (10th Cir. 1998)) (discussing a conspiracy claim under § 1983); *Janny v. Gamez*, 8 F.4th 883, 919 (10th Cir. 2021) (discussing a conspiracy claim under § 1983); *cf. United Bhd. of Carpenters & Joiners of Am. v. Scott*, 463 U.S. 825, 828–29 (1983) (explaining the elements of a conspiracy claim under § 1985(d)).
[235] *Bledsoe* 53 F.4th at 609 (citing *United States v. Edmonson*, 962 F.2d 1535, 154 (10th Cir. 1992)).
[236] *Snell v. Tunnell*, 920 F.2d 673, 702 (10th Cir. 1990) (citing *Cameo Convalescent Ctr. v. Senn*, 738 F.2d 836, 839–40 (7th Cir. 1984), *cert. denied*, 469 U.S. 1106 (1985)).
[237] Compl. ¶ 135.
[238] *Id.* ¶ 15.

Other than this one explicit reference, the only other possible references are the ones involving "Defendants." Collective pleadings are often problematic. Because this case implicates qualified immunity, it is especially important to describe who did what, "to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective claims against the state."[239] Moreover, the statements describing Defendants' collective conduct are conclusory.[240] Conclusory statements such as these may be helpful to structure the complaint, but only if supported by factual pleadings.[241] The complaint sometimes contains such averments, but it mainly describes SITLA and DNR's alleged conduct.[242] And to the extent the Complaint alleges that Governor Cox was aware of these matters, acquiescence is insufficient to bring an individual capacity claim. The Complaint failed to provide factual allegations that could plausibly sustain a claim against Governor Cox in his individual capacity.

### b.   Director Ure

As to Director Ure, the Complaint concludes that SITLA and its officers' conspiracy to prevent the Tribe from purchasing Tabby Mountain "was motivated by animus based on race, national origin, ethnicity and religion"[243] and "[b]ut for the unlawful discrimination, SITLA would have sold the property to the Tribe."[244] As to the existence of a plan to deprive constitutionally protected rights, the Complaint alleges that a consultant's memo sent on December 20, 2018, raised the concern internally that Director Ure structured the Tabby Mountain sale with the purpose of selling the land to DNR.[245] Further, the Complaint asserts that

---

[239] *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008).
[240] Compl. ¶¶ 136–147. For example, paragraph 143 states that "Defendants' actions and conspiracy to create a public record to hide the true reason for SITLA's decision to suspend the sale were based upon animus based upon race, ethnicity, national origin, and religion."
[241] *Twombly*, 550 U.S. at 555.
[242] Compl. ¶¶ 72–108.
[243] *Id*. ¶¶ 135–137.
[244] *Id*. ¶ 142.
[245] *Id*. ¶¶ 62–64.

Tim Donaldson, a SITLA Special Projects Manager, alleged in his whistleblower complaint that the process was "rigged from the beginning to prevent the Tribe from acquiring Tabby Mountain."[246]

Next, as to an act in the furtherance of the plan, the Complaint alleges that on February 28, 2019, Tim Donaldson suggested that SITLA negotiate deed restrictions for public sportsmen, to which Director Ure "responded that the decision had been made to not contact the Tribe."[247] Such deed restrictions could have plausibly alleviated the concern about public use of the land. Yet, it is alleged that Director Ure allowed DNR to submit a higher "sham" bid, which was contingent on DNR accessing millions of dollars.[248] These facts push the Complaint from conceivable to plausible that Director Ure's decisions may have been motivated because of the Tribe's protected status. Taken together, the Complaint plausibly asserts a constitutional conspiracy claim against Director Ure.

### c.   Director Styler

The Complaint's only mention of Director Styler is the following: "Michael Styler was the Director of DNR from about January 2005 until June 2019 and took actions related to this matter under the color of law of the State of Utah."[249] Even if the averment that Director Styler "took actions related to this matter" were non-conclusory, this alone is not enough to bring a plausible claim. To bring a claim, the pleadings must contain factual allegations supporting intent to discriminate because of the Tribe's protected status. Because the Complaint fails to provide details about Director Styler's conduct, the Complaint fails to allege a conspiracy claim against Director Styler.

---

[246] *Id*. ¶ 105.
[247] *Id*. ¶ 78.
[248] Compl. ¶ 88.
[249] *Id*. ¶ 13.

####        d.        Director McConkie

The Complaint only mentions Director McConkie as being "the current director of SITLA."[250] The Complaint pleads that SITLA "is holding the sale in a suspended status, rather than cancelling the sale, based upon the same unlawful discriminatory intent and conspiracy to discriminate."[251] It appears that the Complaint alleges that her assent to the conspiracy is manifest by an act of omission—failing to lift the suspended status of the Tabby Mountain sale. This averment does not plausibly allege a concerted action with the other defendants. More is needed to demonstrate assent. The Complaint fails to meet the pleading standard as to Director McConkie.

####        3.        Conclusion

The Complaint fails to plead its conspiracy claims against Governor Cox and Director McConkie. The Complaint also fails to plead its Title VI claims against all defendants. Because individuals cannot be sued under Title VI, those claims against the individual defendants are dismissed with prejudice because any amendment would be futile.[252]

## II.   State Claims

The Complaint asserts breach of trust, fraud, and breach of contract claims against the Defendants.[253] Defendants also seek to dismiss the state law claims[254] under the relevant statute

---

[250] *Id* ¶ 12.

[251] *Id*. ¶ 109.

[252] *Webb v. Swensen*, 663 Fed. App'x 609, 613 (10th Cir. 2016) (citing *Shotz v. City of Plantation*, 344 F.3d 1161, 1171 (11th Cir. 2003) ("It is beyond question . . . that individuals are not liable under Title IV.")). Defendants also raise the argument that sovereign immunity bars specific performance of a contract. SITLA/McConkie MTD 9. The court declines to address remedies at this stage of the proceedings.

[253] *Id.*

[254] Compl. ¶¶ 153–183.

of limitations and notice of claim requirements.[255] These claims fall under the court's

supplemental jurisdiction and are governed by state substantive law.[256]

### A.    Notice of Claim

Defendants move to dismiss the Tribe's state law claims because the Tribe did not file

any notice of claims with any Utah entity prior to bringing this action.[257] Under the

Governmental Immunity Act of Utah ("UGIA"), "Any person having a claim against a

governmental entity, or against the governmental entity's employee for an act or omission

occurring during the performance of the employee's duties . . . shall file a written notice of claim

with the entity *before maintaining an action*."[258] The notice must be filed "within one year after

the claim arises regardless of whether or not the function giving rise to the claim is characterized

as governmental."[259] The Supreme Court of Utah has held that "[t]he notice of claim provisions

of the Governmental Immunity Act are jurisdictional."[260] Thus, if the Tribe failed to comply, the

court would lack subject matter jurisdiction over the state law claims.[261]

Defendants argue that the state law claims should be dismissed because the Tribe failed

to file a notice of claims with the relevant Utah entities prior to bringing this action.[262] Further,

they assert that even if they were to file a notice of claims now, the one-year deadline to file has

already passed.[263] However, Defendants fail to note that the UGIA waves immunity "as to any

---

[255] Ure MTD 11; SITLA/McConkie MTD 11–21; Cox/Styler MTD 26–31.

[256] *Sawyers v. Norton*, 962 F.3d 1270, 1287 (10th Cir. 2020).

[257] While notice of claim provisions are required for state law claims brought in federal court, they "are inapplicable to § 1983 actions brought in federal court." *Felder v. Casey*, 487 U.S. 131, 140 (1988).

[258] Utah Code Ann. § 63G-7-401(2) (Westlaw through 2023 2nd Spec. Legis. Sess.) (emphasis added).

[259] § 63G-7-402.

[260] *Thomas v. Lewis,* 26 P.3d 217, 221 (Utah 2001).

[261] *Id.*; *Patterson v. Am. Fork City*, 67 P.3d 466, 471 (Utah 2003) ("A plaintiff's failure to comply with the UGIA's notice of claim provisions deprives the trial court of subject matter jurisdiction."); *see Jones v. City of Cottonwood Heights*, No. 22-cv-302, 2002 WL 10052834, at *3 (D. Utah Oct. 17, 2022).

[262] SITLA/McConkie MTD 10–11.

[263] *Id.* at 11.

contractual obligation" and "[a]ctions arising out of contractual rights or obligations are not subject to the requirements of Section 63G-7-401 [and] . . . -402." Thus, the Tribe was not obligated to comply with the notice requirements in bringing its breach of contract claim. The other state claims, however, are governed by the UGIA because they do not arise out of contractual rights or obligations.[264]

The Tribe does not allege compliance with the notice of claim provisions in the UGIA. Nor do they refute Defendant's assertion that they failed to file their notice of claims prior to filing their Complaint.[265] Instead, the Tribe disagrees that any notice was required by the statute, but "to eliminate the issue, the Tribe will submit them."[266] The Tribe requests that the court "should hold in abeyance any decision on those claims pending submission and rejection of the claims."[267]

Filing a notice prior to bringing an action implicating the UGIA is required by the plain meaning of the statute.[268] And the statute requires that the party submit the notice "before maintaining an action."[269] The Tribe's non-breach of contract state law claims are dismissed.

### B.   Breach of Contract Claims

Defendants assert that the Complaint fails to state a breach of contract claim. They contend that SITLA and the Tribe could not have formed a contract when there was no acceptance in the form of a certificate of sale, as required by SITLA administrative rules.[270]

---

[264] *See Israel v. Univ. of Utah*, 2017 WL 1383684 (D. Utah. April 18, 2017) (establishing that a fiduciary duty claim is usually considered a form of tort and estoppel claims do not create any sort of contractual relationship).
[265] Resp. in Opp. to Ure MTD 12.
[266] *Id.*
[267] *Id.*
[268] Utah Code Ann. § 63G-7-402 (Westlaw through 2023 2nd Spec. Legis. Sess.).
[269] § 63G-7-401(2).
[270] SITLA/McConkie Reply 4.

"An enforceable contract . . .  consists of the terms of a bargained-for exchange between the parties. And the terms of the bargain are defined by the meeting of the minds of the parties— through an offer and acceptance upon consideration."[271] "The elements of a prima facie case for breach of contract are (1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages."[272]

The Tribe asserts that because SITLA's "Offer to Purchase" form stated that the highest bidder would have the right to purchase the Tabby Mountain property, the Tribe's bid and $1,000,000 in earnest money met the elements for contract formation.[273]

SITLA's administrative code states that "[a] bid constitutes a valid offer to purchase."[274] Thus, the Tribe's bid and earnest money was only an offer. Turning to acceptance, the bid solicitation stated that all sales will be finalized on SITLA's standard certificate of sale."[275] Administrative rules state that the certificate "shall not be final and no rights shall vest in the purchaser until the certificate is executed by the director. The agency reserves the right to cancel a sale of trust for any reason prior to execution of the certificate."[276] The Complaint never alleges that a certificate of sale was issued, let alone a certificate of sale executed by an authorized individual. Because the certificate is needed in order to establish acceptance under SITLA's regulations, no contract could have formed.

### 1.    Estoppel

The Tribe also asserts that it could enforce contractual rights through "promissory [or] equitable estoppel."[277] Utah courts "typically only apply equitable estoppel to circumstances

---

[271] *Rossi v. Univ. of Utah*, 496 P.3d 105, 112 (Utah 2021).
[272] *Am. W. Bank Members, LC v. Utah*, 2014 UT 49, ¶ 15, 342 P.3d 224.
[273] Resp. in Opp. to SITLA/McConkie MTD 6.
[274] Utah Admin. Code R.850-80-620(5).
[275] Compl. ¶ 71.
[276] Utah Admin. Code. R.850-80-700(4) (effective until October 31, 2020).
[277] Compl. ¶ 174.

involving misrepresentations of past or present fact, along with the other necessary factors. "Equitable estoppel reflects circumstances where it is not fair for a party to represent facts to be one way to get the other to agree, and then change positions later to the other's detriment."[278] "Promissory estoppel, on the other hand, contemplates circumstances where a party promises that things will be a given way in the future, knowing at the time of the promise all of the material facts, but is ultimately wrong, and where the other relies on that promise in acting (or withholding action)."[279] The Complaint does not properly assert an equitable estoppel claim because the pleadings do not involve a situation where one party is induced to contract, the other party changes positions, and the doctrine is used as a defense.

Defendants argue that the usual rules of estoppel do not apply against a state entity. But that is in *equitable* estoppel cases.[280] Promissory estoppel requires that: (1) [t]he plaintiff acted with prudence and in reasonable reliance on a promise made by the defendant; (2) the defendant knew that the plaintiff had relied on the promise which the defendant should reasonably expect to induce action or forbearance on the part of the plaintiff or a third person; (3) the defendant was aware of all material facts; and (4) the plaintiff relied on the promise and the reliance resulted in a loss to the plaintiff.[281]

The Complaint alleges that SITLA promised to sell the property to the highest bidder, which the Defendants reasonably knew would cause the Tribe to rely on the promise.[282] However, the Complaint avers no fact making it plausible that the Tribe reasonably relied on

---

[278] *Youngblood v. Auto-Owners Ins. Co.*, 158 P.3d 1088, 1092 (Utah 2007).
[279] *Id.*
[280] *See, e.g., Monarrez v. Utah Dep't of Transp.*, 368 P.3d 846, 859 (Utah 2016); *Celebrity Club, Inc. v. Utah Liquor Control Comm'n*, 602 P.2d 689, 694 (Utah 1979). The Supreme Court of Utah has noted that "[s]adly, we have mixed and muddled" the distinction between the estoppel theories." *Youngblood*, 158 P.3d at 1092. This court declines to exacerbate the problem by further conflating the two as equals when Utah courts appear to be in the process of distinguishing equitable and promissory estoppel.
[281] *Id.*
[282] Compl. ¶ 177.

SITLA's stated proposal to award the Tabby Mountain property to the highest bidder when SITLA's regulations allow the agency to "cancel a sale of trust land for any reason prior to execution of the certificate by the director."[283] Moreover, the mere expectation that SITLA would "not halt the sale" is not something that can reasonably be expected to induce action or forbearance. Promissory or equitable estoppel cannot save the Complaint's contract claims.

## 2.  Equitable Conversion

Equitable conversion "operates to protect a buyer's interests from a seller's creditors as soon as the contract becomes capable of specific enforcement by the buyer—in other words, at the time the buyer could sue the seller for specific enforcement of the contract if the seller fails to perform.[284] Because no contract was formed, equitable conversion does not apply here. The doctrine only applies "to convert the monetary interest that [the buyer] has in the property to an interest in real estate so that he may invoke the powers of an equity court to compel specific performance of the real estate contract."[285] Thus, because there is no real estate contract under which to compel specific performance, the Complaint failed to state a claim. The contract claims are dismissed.

---

[283] Utah Admin. Code R. 850-80-700(3) (enacted October 9, 2007) (effective until October 31, 2020).
[284] *SMS Fin., LLC v. CBC Fin. Corp.*, 417 P.3d 70, 74 (Utah 2017).
[285] *Butler v. Wilkinson*, 740 P.2d 1244, 1255 n.5 (Utah 1987).

**ORDER**

In sum, the court DENIES IN PART and GRANTS IN PART Defendants' Motions to

Dismiss.[286]

- The Tribe's federal claims against Governor Cox in his official capacity are

    DISMISSED WITHOUT PREJUDICE.

- The Tribe's federal claims against SITLA are DISMISSED WITHOUT PREJUDICE.

- The Tribe's 42 U.S.C. § 2000d (Title VI) claims against the individual Defendants are

    DISMISSED WITH PREJUDICE.

- The Tribe's conspiracy claims against Governor Cox, Director McConkie, and Director

    Styler in their individual capacities are DISMISSED WITHOUT PREJUDICE.

- The Tribe's state law claims are DISMISSED WITHOUT PREJUDICE.


Signed June 13, 2024.


                            BY THE COURT

                            _____

                            David Barlow
                            United States District Judge

---

[286] Ure MTD, ECF No. 17; SITLA/McConkie MTD, ECF No. 23; Cox/Styler MTD, ECF No. 25.